764 S.E.2d 706

**The STATE, Respondent,**

v.

**Michael Wilson PEARSON, Appellant.**

Appellate Case No.2012–212430.

No. 5251.

Court of Appeals of South Carolina.

Heard June 17, 2014.

Decided July 30, 2014.

Withdrawn, Substituted and Refiled Oct. 8, 2014.

Rehearing Denied Nov. 21, 2014.

Certiorari Granted March 4, 2015.

Appellate Defender Kathrine H. Hudgins, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Jennifer Ellis Roberts, both of Columbia, for Respondent.

GEATHERS, J.

Appellant Michael Wilson Pearson challenges his convictions for first-degree burglary, armed robbery, grand larceny, kidnapping, and possession of a weapon during the commission of a violent crime. Pearson argues the State failed to present substantial circumstantial evidence of his involvement in any of the crimes charged and, therefore, the trial court erred in denying his motion for a directed verdict. We reverse.

## FACTS/PROCEDURAL HISTORY

Around 6:15 a.m. on May 15, 2010, Edward "Slick" Gibbons was jumped by three men as he exited his garage. The three men robbed Gibbons of approximately $840, beat him, and wrapped duct tape around his head. Following the attack, the men fled the scene in Gibbons' 1987 Chevrolet El Camino. The vehicle was discovered approximately thirty minutes later, abandoned on the side of a nearby road. A fingerprint

recovered from the rear of the vehicle was matched to Pearson. The duct tape removed from Gibbons' head contained DNA evidence, which was matched to Victor Weldon.

Pearson and Weldon were both indicted for attempted murder, first-degree burglary, armed robbery, grand larceny, kidnapping, and possession of a weapon during the commission of a violent crime. A joint trial was held May 16 through May 18, 2012. At the time of trial, investigators had yet to identify a third suspect.

At trial, Gibbons testified that as he was leaving for work, three black men wearing masks came out of the storage room inside of his garage and threw him on the ground. According to Gibbons, one of the men sat on top of his legs, while the other two men hit and kicked him. While Gibbons was on the ground, the men wrapped duct tape around his head. Gibbons claimed that one of the men had something in his hand that "looked like a pistol." He further testified the men took all of the money in his wallet and then one of the men asked him, "Slick ... where is the rest of it[?]" After the robbery, the three men left the garage and started to drive away. Gibbons described how he pulled himself off the ground and looked out a window in the garage to see them driving off in his El Camino. Gibbons noted that when he got up, one of the men, who was seated in the rear bed of the El Camino, jumped out of the vehicle, ran back, and knocked him unconscious.

Cecil Eaddy, a local farmer, testified he found the abandoned El Camino around 6:40 a.m. with the motor running and the passenger door open. Eaddy recounted how he turned the vehicle off and took the keys to Gibbons' auto parts store. Eaddy stated he returned the keys so that one of Gibbons' employees could drive the vehicle back to the store. Walter Bush, an employee at Gibbons' store, corroborated Eaddy's testimony. According to Bush, Eaddy picked him up from the store and drove him to the location of the vehicle. Bush testified he drove the vehicle "straight back to the store."

Ricky Richards, an investigator with the Clarendon County Sheriff's Office, testified he went to Gibbons' store, where he processed the El Camino. Richards stated he lifted fingerprints from the driver's side "door jamb" and the "rear quarter on the driver's side." On cross-examination, Richards

admitted there was no way to determine when the fingerprints were left on the vehicle.

Investigator Thomas "Lin" Ham testified he visited Gibbons at the hospital on the day of the crimes.[1] Ham indicated that while he was at the hospital, he took the duct tape that was removed from Gibbons' head into evidence. In addition, Ham testified that during an interview with Pearson following his arrest, Pearson "adamantly denied knowing Mr. Gibbons." Ham elaborated: "[Pearson] told me he didn't know where [Mr. Gibbons] lived. He had never been there. He had never been to [Mr. Gibbons'] place of business. He had never come into contact with [Mr. Gibbons'] vehicle."

Marie Hodge, the automated fingerprint identification system (AFIS) examiner at the Sumter Police Department, was qualified as an expert in fingerprint identification. Hodge testified she ran seven fingerprints lifted from the vehicle through the AFIS but did not obtain an identification for any of the prints. After obtaining no hits, Hodge printed out the fingerprints of persons of interest from the AFIS and compared each set of prints "one-on-one" to the lifted fingerprints. According to Hodge, a side-by-side comparison of the prints showed that a right thumbprint found on the rear of the vehicle belonged to Pearson. Hodge later received a card containing Pearson's ink-rolled fingerprints from the Sheriff's Office and compared the prints on the card to the lifted thumbprint. Hodge testified the comparison "reaffirmed" that the thumbprint belonged to Pearson. On cross-examination, Hodge conceded that she was unable to "date" or "age" a fingerprint. She further testified that when left undisturbed, a fingerprint "can be there for quite some time."

Investigator Kenneth Clark testified he interviewed Pearson following Pearson's arrest. Clark noted that during the interview, Pearson denied ever being around Gibbons or Gibbons' property. According to Clark, when he informed Pearson that his fingerprint had been found on Gibbons' vehicle, Pearson declined to comment. Clark testified that subsequent investigation revealed Pearson had previously worked on a landscaping project at Gibbons' residence.

---

1. Investigator Ham testified he had known Gibbons all of his life and frequently referred to Gibbons as "Mr. Slick" throughout his testimony.

Clark also testified concerning the investigation into co-defendant Victor Weldon's involvement in the crimes. He noted that during an interview with Weldon, Weldon denied knowing Pearson or having any involvement in the crimes. Clark indicated, however, that records from the South Carolina Vocational Rehabilitation Center revealed Pearson and Weldon both worked at the same job training program from December 9 through December 12, 2008.

Richard Gamble, a local landscaper, testified Pearson had previously assisted him in doing landscaping work for Gibbons and Gibbons' son, who lived on the same block. Gamble could not recall the exact date of the landscaping project; however, he indicated it took place in the spring of 2009 or 2010. He estimated the project lasted "at least 5 days." Gamble testified that while working on the project, he observed Pearson enter Gibbons' garage in order to retrieve job-related tools that were located in the storage area.

The State also presented the testimony of John Hornsby, who worked as an area supervisor at the South Carolina Vocational Rehabilitation Center. According to Hornsby, time cards and attendance records revealed Pearson and Weldon were both assigned to the facility's woodshop from December 9 through December 12, 2008. Hornsby stated that around twenty-five individuals generally worked at the woodshop on a daily basis.

After the State rested, Pearson and Weldon both moved for a directed verdict on all charges. Pearson argued that even though his fingerprint was found on the outside of Gibbons' car, the fingerprint was insufficient to place him at the crime scene. In reply, the State argued the fingerprint was found on the rear of the vehicle, where Gibbons testified one of the men who robbed him had been seated as they fled his house. The State also pointed to evidence that the two co-defendants attended the same job training program over a four-day period, as well as testimony that Pearson had done landscaping work at Gibbons' home. The trial court denied Pearson's and Weldon's motions for a directed verdict. The trial court stated:

As far as Mr. Pearson's fingerprint[,] the evidence in this case that has come before this jury that I recall he told the

police officer he did not know Mr. Gibbons. He had not been at his house or his place of business. His vehicle was taken that morning. Within 30 minutes[,] the vehicle was found abandoned a mile and a half or two miles away. The vehicle was processed and was carried to the auto parts place and processed. That day his fingerprint was found on the vehicle. And I certainly think at least that's sufficient evidence for the jury to make a determination of guilt or innocence in this case. And I respectfully deny your motion.

The jury found Pearson and Weldon guilty of burglary in the first degree, armed robbery, grand larceny, kidnapping, and possession of a weapon during the commission of a violent crime. The trial court sentenced Pearson to a total of sixty years' imprisonment. This appeal followed.

## STANDARD OF REVIEW

 "On appeal from the denial of a directed verdict, [an appellate court] must view the evidence in the light most favorable to the State." *State v. Odems*, 395 S.C. 582, 586, 720 S.E.2d 48, 50 (2011). "[I]f there is any direct or *substantial* circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury." *Id.*

## LAW/ANALYSIS

 Pearson argues the circumstantial evidence presented by the State did not rise to the level of substantial circumstantial evidence necessary to submit the case to the jury. We agree.

 " 'A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged.' " *State v. Lane*, 406 S.C. 118, 121, 749 S.E.2d 165, 167 (Ct.App. 2013) (quoting *State v. Brannon*, 388 S.C. 498, 501, 697 S.E.2d 593, 595 (2010)). "The State has the burden of proving beyond a reasonable doubt the identity of the defendant as the person who committed the charged crime or crimes." *Id.; see also State v. Schrock*, 283 S.C. 129, 133, 322 S.E.2d 450, 452 (1984) (noting the State has the burden of proving "the accused was at the scene of the crime when it happened and

that he committed the criminal act"). If there is substantial circumstantial evidence reasonably tending to prove the defendant's guilt, an appellate court must find the trial court properly submitted the case to the jury. *Lane,* 406 S.C. at 121, 749 S.E.2d at 167 (citing *Odems,* 395 S.C. at 586, 720 S.E.2d at 50). "Evidence must constitute positive proof of facts and circumstances which reasonably tends to prove guilt." *State v. Bostick,* 392 S.C. 134, 139, 708 S.E.2d 774, 776 (2011). "The lower court should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty." *State v. Mitchell,* 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000). " 'Suspicion' implies a belief or opinion as to guilt based upon facts or circumstances [that] do not amount to proof." *State v. Buckmon,* 347 S.C. 316, 322, 555 S.E.2d 402, 404–05 (2001).

In this matter, the key evidence relied upon by the State to place Pearson at the crime scene was the presence of his fingerprint on the rear of Gibbons' vehicle. Our courts have addressed the sufficiency of fingerprint evidence where the State relies on such evidence to prove a defendant's guilt. We find a review of these cases is instructive in determining whether the circumstantial evidence presented by the State met the "substantial circumstantial evidence" standard.

In *Mitchell,* our supreme court affirmed this court's decision that Mitchell was entitled to a directed verdict on a burglary charge. 341 S.C. at 409, 535 S.E.2d at 127. The only evidence linking Mitchell to the burglary was his fingerprint on a window screen that was propped up against the exterior of the victim's house. *Id.* at 408–09, 535 S.E.2d at 127. The court found the fingerprint evidence was insufficient to prove Mitchell's guilt because there was testimony Mitchell had been in and around the victim's house at least three times before the burglary. *Id.* at 409, 535 S.E.2d at 127. Additionally, the court reasoned a directed verdict was appropriate because "[t]he State did not present any evidence whether the screen was on the window at the time the window was broken or when the screen had been removed." *Id.*

Similarly, in *State v. Bennett,* 408 S.C. 302, 306, 758 S.E.2d 743, 745 (Ct.App.2014), this court assessed whether evidence of Bennett's fingerprint and DNA at the site of a burglary

constituted substantial circumstantial evidence. Therein, a television, computer, monitor, and keyboard were stolen from a Spartanburg community center. *Id.* at 303–04, 758 S.E.2d at 744. Bennett's fingerprint was discovered on a wall-mounted television in the community room that appeared to have been manipulated by the burglar. *Id.* Additionally, two droplets of Bennett's blood were found directly below the location of a missing television in the computer room. *Id.* at 305, 758 S.E.2d at 745. It was undisputed that Bennett was a frequent visitor to the center before the crime and spent much of his time in the computer room. *Id.* at 307, 758 S.E.2d at 745. The director of the center testified she did not recall seeing Bennett in the community room, which was solely used for scheduled events. *Id.* at 304–05, 758 S.E.2d at 744. However, the director acknowledged that the community room was not always locked or consistently monitored. *Id.*

Applying the directed verdict standard, the *Bennett* court found the State did not present substantial circumstantial evidence reasonably proving Bennett's guilt. *Id.* at 307, 758 S.E.2d at 746. The court recognized the evidence presented by the State "undoubtedly placed Bennett at the *location where a crime ultimately occurred.*" *Id.* However, the court rejected the State's assertion that the evidence served to "place[ ] Bennett *at the scene of the crime.*" *Id.* The court reasoned the exact locations of the DNA and fingerprint evidence "d[id] not rise above suspicion" because it was not "unexpected" to find Bennett's DNA and fingerprints in a communal area he frequented before the crime. *Id.*

Additionally, in *State v. Arnold,* 361 S.C. 386, 390, 605 S.E.2d 529, 531 (2004), our supreme court held that fingerprint evidence placing Arnold in the victim's borrowed vehicle on the same day the victim was last seen alive was not substantial and merely raised a suspicion of Arnold's guilt. In *Arnold,* the victim's body was discovered off a dirt road in Colleton County, South Carolina. *Id.* at 388, 605 S.E.2d at 530. The victim was last seen alive three days earlier, when he borrowed a colleague's BMW to go to a dentist appointment. *Id.* One of the State's witnesses testified he had introduced the victim to Arnold. *Id.* The witness indicated he had received a message from Arnold to call him at a phone number belonging to Arnold's father, who lived in Gray, Tennessee. *Id.* at 389,

605 S.E.2d at 530. The borrowed BMW was later found in a parking lot in Johnson City, Tennessee, approximately ten miles away from where Arnold's father lived. *Id.* at 389–90 & n. 3, 605 S.E.2d at 530–31 & n. 3. The BMW had unspecified scratches on it, and a coffee cup lid containing Arnold's fingerprint was found in the car's center console. *Id.* at 389, 605 S.E.2d at 530. In concluding that the circumstantial evidence presented by the State was insufficient to overcome a directed verdict motion, the court reasoned:

> Viewing the evidence most favorably to the State, [Arnold]'s fingerprint on the coffee cup lid tab establishes he was in the borrowed BMW on the same day the victim was last seen alive. The fact that the BMW was found abandoned in Tennessee, the same state where [Arnold] was located after his stay in Savannah, raises a suspicion of guilt but is not evidence that [Arnold] killed [the victim]. Further, there is no evidence [Arnold] was at the scene of the crime, which according to the State's theory was in Colleton County.

*Id.* at 390, 605 S.E.2d at 531 (footnote omitted).

Under the facts of this case and consistent with the reasoning in the aforementioned cases, there is insufficient evidence tying Pearson to the crimes. Here, the most damaging evidence was Pearson's fingerprint on the rear of Gibbons' vehicle. However, there was other evidence showing Pearson may have had an opportunity to come in contact with the vehicle before the crimes occurred. For instance, there was testimony that Gibbons regularly parked his vehicle in a public lot adjacent to his store. Moreover, there was testimony that Pearson assisted with a five-day landscaping project at Gibbons' residence, and he could have come in contact with the vehicle at that time. *See Mitchell,* 341 S.C. at 409, 535 S.E.2d at 127 (finding that fingerprint evidence was insufficient to prove the defendant's guilt because there was testimony the defendant had been in and around the victim's house at least three times before the burglary). Most notably, the State's fingerprint expert testified she could not determine when the print was placed on the vehicle and that such a print could remain on a vehicle for an indefinite period if left undisturbed. Because the State offered no timing evidence to contradict reasonable explanations for the presence of the fingerprint, the jury could only have guessed the fingerprint was made at

the time of the crimes. *See Buckmon*, 347 S.C. at 322–23, 555 S.E.2d at 405 (holding defendant was entitled to a directed verdict where none of the evidence presented by the State placed defendant at the crime scene and the jury was left to speculate as to defendant's guilt).

We further note the additional incriminating evidence presented by the State failed to fill the gaps in proof and left the jury to speculate as to Pearson's guilt. *See State v. Ballenger*, 322 S.C. 196, 199, 470 S.E.2d 851, 853 (1996) ("The motion [for a directed verdict] should be granted where a jury would be speculating as to the accused's guilt or where the evidence is sufficient only to raise a strong suspicion of guilt." (citation omitted)). In addition to the fingerprint, the State offered evidence that Pearson and his co-defendant, Weldon, previously attended the same job training program. It would be speculative, however, to infer a relationship between the two co-defendants considering approximately twenty-five individuals took part in the job training program. At most, this evidence demonstrates the two co-defendants worked in the same facility at the same time. Moreover, Pearson and Weldon both denied knowing each other during their separate interviews with investigators. Although it is possible Pearson and Weldon interacted during the program, it is not incredible that neither man could remember a fellow participant in a program they attended more than a year before the crimes. Despite the fact Weldon was tied to the crimes because of his DNA on the duct tape, nothing tied Pearson to the crime scene.

▇ Viewing all of the evidence in the light most favorable to the State, there was insufficient evidence to submit the case to the jury. The recovered fingerprint directly tied Pearson to the stolen vehicle. Nonetheless, the fingerprint merely raised a suspicion of Pearson's guilt because there was no additional evidence showing when the fingerprint was placed on the vehicle. Moreover, none of the other evidence presented by the State placed Pearson at the crime scene or established a relationship between Pearson and Weldon. For this reason, the jury could only have guessed Pearson was involved in the crimes. "[S]uspicion, however strong, does not suffice to sustain a conviction." *State v. Hyder*, 242 S.C. 372, 379, 131 S.E.2d 96, 100 (1963). A defendant is entitled to a judgment

of acquittal "where [the] evidence merely raises a suspicion of guilt, or is such as to permit the jury to merely conjecture or to speculate as to the accused's guilt." *State v. Brown*, 267 S.C. 311, 316, 227 S.E.2d 674, 677 (1976). Accordingly, we find the trial court erred by denying Pearson's directed verdict motion.

## CONCLUSION

For the foregoing reasons, Pearson's convictions are

**REVERSED.**

FEW, C.J., and SHORT, J., concur.