771 S.E.2d 346

The STATE, Respondent,

v.

Kenneth Andrew LYNCH, Appellant.

Appellate Case No. 2012–212547.
No. 5304.

Court of Appeals of South Carolina.

Heard Feb. 3, 2015.
Decided March 18, 2015.
Rehearing Denied May 6, 2015.

160

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General J. Anthony Mabry, all of Columbia; and Solicitor Donald V. Myers, of Lexington, for Respondent.

LOCKEMY, J.

This case arises out of the disappearance of Portia Washington and her granddaughter, Angelica Livingston (collectively, the victims). The victims were last seen on June 10, 2006. Their bodies have never been recovered. The State indicted Kenneth Lynch with grand larceny of Portia's car and with the murder of the victims. Lynch was convicted as indicted following a bench trial before the Honorable Eugene C. Griffith, Jr. The State sought the death penalty; however, the trial court sentenced Lynch to two terms of life imprisonment without the possibility of parole for the murders and ten years' imprisonment for grand larceny. Lynch appeals his convictions, arguing the trial court erred in (1) denying his motion for a directed verdict because the State failed to present substantial circumstantial evidence of his guilt; (2) not giving a jury instruction regarding how to use and evaluate circumstantial evidence; and (3) not suppressing evidence seized during his arrest because the arrest warrant was not supported by probable cause. We affirm.

**FACTS**

**A. The State's Case**

At trial, Linda Miller, Portia's friend, testified the victims lived together and Portia was Angelica's caretaker. Miller explained Portia enjoyed her job at Bob Bennett Ford, where she worked as a custodian. Portia had recently purchased a new car, which she loved. While working at Bob Bennett Ford, Portia developed a romantic relationship with Lynch, a fellow co-worker. According to Miller, Portia and Lynch were living together in June 2006, when the victims disappeared. Miller explained that before Portia met Lynch she was happy but that began to change. Miller admitted she had never met

Lynch. Miller stated the last time she saw the victims was on Friday, June 9, 2006, and on that day, Portia did not tell her she was planning to take a trip.

Shyla Andrews, the victims' hair stylist, stated she last saw the victims on Saturday, June 10, 2006, when they were scheduled for a hair appointment. Andrews testified that on that day, Portia was acting nervous and was in a hurry to leave. Andrews stated Portia developed into a nervous person when she began dating Lynch, and she advised Portia to end the relationship. According to Andrews, Portia had a close relationship with her family, and she would not disappear without telling them where she was going.

Lela Green, another friend of Portia's, stated Portia called her on Saturday, June 10, 2006, around 6:00 p.m. and told her she was going to the grocery store to buy food to cook for Sunday lunch. Green stated she planned to have lunch with Portia on Sunday, June 11, 2006, but she never saw Portia again. According to Green, Portia enjoyed her job, and she never told her she was planning to leave South Carolina.

Carla Perry, Portia and Lynch's neighbor, testified she last saw the victims on the afternoon of Saturday, June 10, 2006. According to Perry, Portia was unloading laundry from her car, which was parked outside the apartment, and Lynch was with Portia standing outside the car. Perry further stated Angelica came by her apartment that afternoon wearing a wet bathing suit and appeared to have been swimming at the apartment complex's swimming pool. According to Perry, around 10:30 p.m. that night, she noticed Portia's car was missing and Portia's plants were outside her apartment, which Perry found strange because Portia always brought her plants inside on Saturday night.

Sallie Jones, Portia's mother, testified she had a close relationship with Portia and they talked every day. Jones claimed Portia loved Angelica, her job, and her new car. According to Jones, Portia would not allow anyone to drive her car, and Portia had given her the spare set of keys to her car and told her she did not want Lynch driving it. Jones, however, admitted that Lynch had previously driven Portia's car to drop off Angelica at her house. Jones explained that before Portia met Lynch, she was very happy and enjoyed

spending time with her family; however, she became less involved with her family after meeting Lynch. Jones stated Portia had never gone more than one week without calling her. Jones stated Portia did not like to drive on the interstate and she rarely traveled outside South Carolina. Jones testified Portia planned to meet her on Sunday, June 11, 2006, but she never heard from her after Saturday, June 10, 2006.

Vernelle Bellamy, Portia's aunt, testified she last saw Portia on Saturday, June 10, 2006. After she had not heard from Portia for several days, she went to Portia's apartment and spoke with the apartment manager. Bellamy stated the apartment manager entered Portia's apartment and told her the apartment "looked like somebody was cleaning up."

Debra Hobgood, a manager at Bob Bennett Ford, testified Portia had worked as a custodian for five years and was a good employee. Hobgood described herself as Portia's friend and she helped Portia pick out her new car and loaned her money for a down payment. Hobgood stated Portia loved her car and would not let anyone drive it. Hobgood asserted that when Portia started dating Lynch, she began to have low self-esteem and was "always questioning what she did." Hobgood gave Portia $650 to find a new apartment because she wanted her to get away from Lynch; however, at the time of the incident, Hobgood was unaware Portia was living with Lynch. Hobgood stated Angelica planned to attend summer camp in the summer of 2006 and was very excited. According to Hobgood, she last saw Portia on Friday, June 9, 2006, and the last thing Portia said to her was, "I'll see you Monday."

Nancy Hyler, the former office manager at Bob Bennett Ford, testified the last pay check issued for Portia was on June 16, 2006, but it was never picked up. Carly Coviello, an employee with T–Mobile, testified the last call made from Portia's cell phone was at 9:26 p.m. on June 10, 2006, in West Columbia. Steven Newnom, an employee at TransUnion Credit Union, testified there had been no credit inquiries for Portia's records. Julia Price, of Ford Motor Credit Company, explained that Portia purchased a 2005 Ford Focus on June 22, 2005, pursuant to a financing agreement with Ford Motor Credit, and the last payment received by Ford was on June 12, 2006. Dawn Hurley testified Portia had checking and

savings accounts with Bank of America. According to Hurley, the last transaction on the savings account was on June 10, 2006, at 9:50 a.m., and the last transaction for the checking account was an automatic draft to Ford Motor Credit on June 12, 2006.

Nicky Rodgers, an employee with Lexington County 911 who had access to a national database for drivers' licenses, found one driver's license for Portia and it was in South Carolina. James Hinton, an employee of Lexington School District Two, testified Angelica last attended school on June 1, 2006, which was the end of her second grade year. The school expected Angelica to return the next year but she never returned, and the school district had received no requests from other schools for Angelica's school transcripts.

Ola Mathis, the former apartment manager of Portia and Lynch's apartment, stated that on June 13, 2006, she entered the victims' apartment and found no signs of forced entry, but that it had been cleaned in a way that looked "staged." She found a girl's church clothes laid on one of the beds. According to Mathis, "the only thing missing" from the apartment were the victims and Portia's car. Mathis explained the lease for the apartment stated Lynch and Portia were married.

Takiesha Shelton, an employee of Motel 6, testified motel records showed Lynch arrived at a motel in Vicksburg, Mississippi, on June 12, 2006, and departed on June 13, 2006. Records also showed Lynch arriving on June 14, 2006, and departing on June 15, 2006, at a motel in Eloy, Arizona. One receipt listed Lynch's address as Florida, but a second receipt showed an address in Cayce.

Shane Ramirez, an officer with the Texas Highway Patrol, testified he stopped Lynch for speeding on June 14, 2006, in Fort Hancock, Texas. Lynch was driving a 2005 Ford Focus that was registered to Portia. There were no passengers in the car but there was a child's car seat in the back. Ramirez described the car as "messy" like "someone had been living out of it." Lynch informed Ramirez that he was coming from Mississippi and was traveling to Arizona to pick up his wife.

Agent Nathan Bresee, formerly a customs and border protection agent in Blaine, Washington, testified he encountered Lynch on June 17, 2006, at 10:45 p.m. at the United

States/Canada border. Agent Bresee explained Lynch had "refusal paperwork" indicating he had been refused entry into Canada. Because Lynch had been refused entry into Canada, Agent Bresee performed a criminal history check on Lynch, which revealed a positive NCIC alert indicating Lynch was a missing person. Agent Bresee contacted the West Columbia Police Department (WCPD) as the reporting agency, and Detective April Bayne of WCPD informed him that Lynch was a suspect in a double homicide. Upon learning this information, Agent Bresee directed border protection agents to conduct two searches of Lynch's person and a search of his two bags.

Agent Bresee found several items in Lynch's possession that he faxed to WCPD, including a Greyhound bus ticket from Seattle, Washington, to Vancouver, Canada, dated June 17, 2006; a Motel 6 receipt dated June 14, 2006; and a second Motel 6 receipt dated June 12, 2006. Agent Bresee stated that at 3:10 a.m. on June 18, 2006, WCPD informed him that an arrest warrant had been issued for Lynch on the charge of grand larceny. Agent Bresee contacted the Whatcom County, Washington Sheriff's Department, and a sheriff's deputy came and served Lynch with an arrest warrant.

Deputy Courtney Polinder served the arrest warrant on Lynch between 4:00 a.m. and 4:30 a.m. on June 18. Deputy Polinder informed Lynch of his *Miranda*[1] rights, retrieved Lynch's property from the border protection agents, and transported Lynch and his property to a county jail in Washington. On the way to jail, Deputy Polinder stated he did not interrogate Lynch, but Lynch made several statements. Lynch denied any involvement with Portia's car, which was listed in the arrest warrant. Lynch denied driving the vehicle to the west coast and stated he had traveled with a friend and then by bus. Lynch told Deputy Polinder he was planning to visit Vancouver, Canada, because he wanted "to see bears," which Deputy Polinder explained was strange because Vancouver is an urban area and bears live further north. Lynch told Deputy Polinder he lived with the victims, had recently

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

166

quit his job, left to visit Canada, and planned to return to South Carolina.

Officer Bradley Richardson of the Seattle Police Department found Portia's car on June 18, 2006, near a Greyhound bus station in Seattle. According to Officer Bradley, the license plates had been removed, and the car was very clean and looked like a rental car. Thereafter, he searched the car and found nothing inside the car or in the trunk.

On June 19, 2006, Agent Brenda Wilson, of the Federal Bureau of Investigation, and Glen Hutchings, a local police officer, interviewed Lynch. During the interview, Lynch stated he quit his job at Bob Bennett Ford on Friday, June 9, 2010, but planned to return to South Carolina to attend a truck driving school. He admitted he and Portia had been in a romantic relationship but claimed their relationship had become "more like roommates" within the last year. Lynch stated he last saw Portia's car on Friday, June 10, 2006, when she drove him home from work. Lynch denied driving Portia's car outside of South Carolina. He stated he not seen Portia since June 10th because they had decided to "go their separate ways."

When Agent Wilson confronted Lynch with evidence that he had been stopped in Texas driving Portia's car, Lynch initially denied driving her car but then admitted it. He claimed Portia had allowed him to drive her car because she was in "over her head" with the payments. Lynch denied knowing the victims' whereabouts and stated it would be out of character for Portia to disappear because she "had a habit of going to the beauty salon and then church." According to Agent Wilson, Lynch acted "shocked" when he heard the victims were missing, and he stated he did not know anyone who would want to hurt them. Lynch further stated he had never seen other men at the apartment. When asked about Portia's car being found in Seattle, Lynch claimed he "just left it there and that he wanted to take the bus up to Canada." Agent Wilson then contacted WCPD with the information she learned from the interview.

Detective Glen Hutchings, formerly of the Bellingham, Washington Police Department, testified he was present during Lynch's interview with Agent Wilson. He claimed Lynch

told him Portia was "head of maintenance" at Bob Bennett Ford and that Lynch "worked in the parts department." Detective Hutchings stated Lynch told him he planned to return to South Carolina to attend a 15–day truck driver training program with Werner Trucking Company. Detective Hutchings was familiar with Werner Trucking Company because his son worked for the company; however, he stated they did not have a 15–day truck driver training program. Detective Hutchings asserted Lynch initially denied driving Portia's car outside South Carolina and stated he had traveled with a friend to Georgia, Louisiana, Mississippi, Texas, California, Oregon, and Washington. According to Detective Hutchings, when Lynch was informed the victims were missing, his response was "very flat" and he did not ask any questions or show any emotion. Detective Hutchings stated Lynch claimed he left the apartment in Portia's car on Friday, June 10. Detective Hutchings further stated Lynch eventually admitted he took Portia's car without her permission, but asserted "she wouldn't have cared anyway because she was going to lose the car."

On June 22, 2006, Rod Green, an agent with SLED, arrived in Seattle where he processed Portia's car pursuant to a search warrant. Green stated the car was empty and the glove box contained no vehicle registration, proof of insurance, or any other paperwork. Green did not find any blood, but he found three fingerprints that belonged to Lynch. Green also took a DNA swab from the steering wheel, which was later determined to belong to Lynch.

On August 3, 2006, Detective Matt Edwards of WCPD went to Washington and transported Lynch back to South Carolina. When he arrived, Detective Edwards took possession of Lynch's two pieces of luggage and transported them to WCPD. Investigator Charles Bramlett testified WCPD later obtained a search warrant for the two bags, and he conducted a search of the bags on September 25, 2006. The following items were found in Lynch's luggage: binoculars; banking documents; old receipts; a wallet; letters; a Greyhound bus ticket dated June 17, 2006; motel receipts; a raffle ticket; tax documents; torn notebook paper with phone numbers; business cards; two sets of keys; a Family Dollar receipt for toiletries dated June 13, 2006; a pay stub; an old traffic

ticket; a South Carolina lottery ticket dated June 10, 2006; a car title; documentation from the Canadian border; jewelry; and clothing.

James Sullivan of WCPD conducted a photographic comparison of the key to Portia's car that Jones claimed Portia gave her, a key recovered from Lynch's luggage, and a key created using Portia's car's VIN. He concluded the keys had the same cuts. Additionally, Sullivan compared two sets of house and mailbox keys found on Lynch and concluded the keys had the same cuts as those for the victims' apartment. Sullivan, however, was unsuccessful in his attempt to use the house key on the apartment door.

Robin Taylor, a DNA analyst from SLED, took DNA samples from Theresa Brown, Angelica's mother, and Sallie Jones, Portia's mother. Taylor confirmed the DNA taken from the steering wheel of Portia's car matched Lynch. Taylor also took DNA samples from the hall bathroom of the apartment and determined that Lynch could not be excluded as a contributor. Taylor explained that a section of the carpet seized from the apartment tested positive for blood and was a mixture of at least two individuals' DNA. The major contributor was consistent with a daughter of Brown. At the time the victims disappeared, Brown had only one daughter—Angelica. The minor contributor was a male, and Lynch could not be excluded as the contributor. Blood was also found on the bottom of a green chair in the apartment, on the master bedroom sink, and on a blue container found in the apartment. All three of these samples contained a mixture of DNA, with the major contributor being a daughter of Brown. Swabs from a different area of the green chair, carpet, and master bedroom door tested positive for blood and the DNA profiles were consistent with a daughter of Brown. Blood was also recovered on two other areas of the carpet and five sections of a sheet found near the green chair with the DNA being from a daughter of Brown.

Steven Derrick, an expert in blood stain analysis, analyzed the blood stains found in the apartment. Derrick opined the right arm of the green chair showed a "broken" droplet of blood with a transfer stain going down the arm. He concluded the three distinctive lines of blood going down the arm

were made by three fingers making contact with the chair. The undercarriage of the green chair showed multiple patterns, including drops, transfers, and smears. The wood portion of the undercarriage of the green chair was broken, and Derrick found what he called a "hair transfer pattern" of blood. He opined the spatter was caused by a medium range of force based upon the size of the droplets, which was caused by a fist or other blunt object. Derrick further opined the chair was not upright when the blood spatter was distributed on the chair. In the hair transfer pattern, Derrick found a "conglomerate of blood" that indicated a wound in the hairline where bloodletting had occurred. Based upon his analysis of the blood, Derrick opined that "something other than a natural incident" occurred in the apartment, specifically an "act of violence." Derrick, however, admitted he could not determine when the incident occurred.

Detective Bayne testified WCPD conducted numerous investigations to locate the victims, with the help of SLED and the Secret Service, but they were unable to find them. Detective Bayne explained their investigation revealed that Lynch had stayed in a Motel 6 in Vicksburg, Mississippi, where he provided a false address. She contacted the Werner Trucking Company and they confirmed they did not have a truck driver training school in South Carolina. Detective Bayne explained that neither Lynch nor Portia picked up their last paychecks from Bob Bennett Ford, and no school district in the country had requested Angelica's school records.

On cross-examination, Detective Bayne testified regarding WCPD's failure to follow-up on tips indicating potential sightings of the victims. For example, a patron at a local ice cream shop claimed she saw "a black female and a little girl that matched the description ... of [the victims]." Although WCPD followed up on the lead and inquired if the shop had video, no one spoke to the patron until six years later. WCPD also took a statement from one of Angelica's teachers who told police in 2006 that Angelica informed him in May 2006 that she was going to Texas; however, WCPD did not follow-up on this lead. In addition, a truck driver claimed he saw a "black female, possibly 50/50 of that being [Portia]" at a truck stop. The trucker said the woman approached him asking for help because she had been left at the truck stop by her boyfriend.

Although the trucker was unsure of the exact date and city, he believed it was the week of June 17, 2006, at a truck stop near El Paso, Texas. Finally, Detective Bayne admitted WCPD did not follow up on six leads received from the National Center for Missing and Exploited Children even though five of the leads indicated sightings in California and one was for a sighting on an Amtrak between Seattle and Portland.

## B. Lynch's Defense

Lynch presented the testimony of Rebecca Kilbride, a teacher at Angelica's school, who stated Lynch picked up Angelica from school two or three times per week. Additionally, George Mook, an employee at Bob Bennett Ford, stated he saw Lynch driving Portia's car "once in a while." Detective Page Moore of WCPD confirmed that a witness claimed to have seen the victims at an ice cream shop in Lexington County; however, WCPD waited six years to contact her. Matt Martin, an investigator for the State, testified that a credit report for Angelica's social security number showed a collection report for an unpaid credit balance under the name of "Sandra Livingston." The collection was for an unpaid medical bill in California in October 2008.

Dr. Kimberly Collins, an expert in forensic pathology, reviewed the photographs from the apartment and found no indication of dragging down the hallway of the apartment. According to Dr. Collins, the photos indicated there was no significant volume of blood to soak through the carpet because neither the bottom of the carpet nor the padding had blood on them. She was unable to form an opinion as to the quantity of blood on the green chair, finding it medically and scientifically impossible. She was also unable to determine the type of injury that may have occurred, how the injury happened, or the severity of the injury.

Following the bench trial, Lynch was convicted of one count of grand larceny and two counts of murder. The trial court sentenced him to ten years' imprisonment for grand larceny and life imprisonment without the possibility of parole for the murders. This appeal followed.

## LAW/ANALYSIS

### I. Directed Verdict

Lynch argues the trial court erred in denying his motion for a directed verdict because the State failed to present substantial circumstantial evidence that he killed the victims, that he was present at the scene of the crime, and that he stole Portia's car. We disagree.[2]

"On appeal from the denial of a directed verdict, [the appellate court] must view the evidence in the light most favorable to the State." *State v. Odems*, 395 S.C. 582, 586, 720 S.E.2d 48, 50 (2011). "[I]f there is any direct or *substantial* circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury." *Id.*

"A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." *State v. Pearson*, 410 S.C. 392, 398, 764 S.E.2d 706, 710 (Ct.App.2014), *cert. granted* (internal quotation marks omitted). "The State has the burden of proving beyond a reasonable doubt the identity of the defendant as the person who committed the charged crime or crimes." *Id.* (internal quotation marks omitted); *see also State v. Schrock*, 283 S.C. 129, 133, 322 S.E.2d 450, 452 (1984) (stating the State has the burden of proving "the accused was at the scene of the crime when it happened and that he committed the criminal act"). "If there is substantial circumstantial evidence reasonably tending to prove the defendant's guilt, an appellate court must find the trial court properly submitted the case to the jury." *Pearson*, 410 S.C. at 399, 764 S.E.2d at 710. "The [trial] court should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty." *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000).

In *State v. Arnold*, our supreme court held fingerprint evidence placing Arnold with the victim on the day of the murder was not substantial and merely raised a suspicion of Arnold's guilt. 361 S.C. 386, 390, 605 S.E.2d 529, 531 (2004). In *Arnold*, the victim's body was discovered off a dirt road in

---

2. At trial, Lynch conceded that the victims were murdered by criminal means.

Colleton County. *Id.* at 388, 605 S.E.2d at 530. The victim was last seen alive three days earlier, when he borrowed a friend's BMW to go to a dentist appointment. *Id.* One of the State's witnesses testified he had introduced the victim to Arnold. *Id.* The witness indicated he had received a message from Arnold to call him at a phone number belonging to Arnold's father, who lived in Gray, Tennessee. *Id.* at 389, 605 S.E.2d at 530. The borrowed BMW was later found in a parking lot in Johnson City, Tennessee, approximately ten miles away from where Arnold's father lived. *Id.* The BMW had unspecified scratches on it, and a coffee cup lid containing Arnold's fingerprint was found in the car's center console. *Id.* In concluding that the circumstantial evidence presented by the State was not sufficient to overcome a directed verdict motion, the court reasoned:

> Viewing the evidence most favorably to the State, [Arnold]'s fingerprint on the coffee cup lid tab establishes he was in the borrowed BMW on the same day the victim was last seen alive. The fact that the BMW was found abandoned in Tennessee, the same state where [Arnold] was located after his stay in Savannah, raises a suspicion of guilt but is not evidence that [Arnold] killed [the victim]. Further, there is no evidence [Arnold] was at the scene of the crime, which according to the State's theory was in Colleton County.

*Id.* at 390, 605 S.E.2d at 531 (footnote omitted).

■ The trial court did not err in denying the motion for a directed verdict because, viewing the evidence in the light most favorable to the State, there was substantial circumstantial evidence of Lynch's guilt. *See Odems,* 395 S.C. at 586, 720 S.E.2d at 50 (recognizing that "[o]n appeal from the denial of a directed verdict, [the appellate court] must view the evidence in the light most favorable to the State"); *id.* ("[I]f there is any direct or *substantial* circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury."). As to grand larceny, multiple witnesses testified Portia loved her car and would not allow anyone to drive it. In particular, Jones stated Portia gave her the spare set of keys to the car because she did not want Lynch driving it. In addition, Lynch was stopped for speeding while driving Portia's car alone in Texas, and according to Detective Hutchings, Lynch later

admitted that he took Portia's car without her permission. Although Lynch presented evidence that he had previously driven Portia's car with her permission, this goes to the weight of the evidence.

As to the victims' murders, the State presented evidence that Lynch was the last person *seen* with the victims at the place where the State alleged the murders occurred. *See State v. Williams,* 303 S.C. 274, 276, 400 S.E.2d 131, 132–33 (1991) (finding "substantial evidence" to prove the defendant's guilt when the victim was employed by the defendant, was last seen alive with the defendant, and the victim's decomposed body was found); *cf. State v. Lane,* 406 S.C. 118, 120, 749 S.E.2d 165, 167 (Ct.App.2013), *reversed by* 410 S.C. 505, 765 S.E.2d 557 (2014) (per curiam) (finding the State failed to present substantial circumstantial evidence that the defendant was guilty of burglary when papers with the defendant's name were found at the crime scene and a car similar to the defendant's was seen in the victim's driveway when the crime occurred). This is an important distinction from *Arnold* where the victim was last seen alone at his office, and although Arnold's fingerprint was found in the victim's car, there was no evidence Arnold was at the scene of the crime. Moreover, Lynch admitted to police he last saw Portia on Friday June 9, 2006—the day before the State alleged the murder occurred. In addition, the State presented forensic evidence that an assault occurred at the apartment where Lynch lived with the victims. Lynch also admitted to police that he did not know anyone that wanted to harm the victims. Other damaging evidence included the fact that a male's DNA was found in the victims' apartment, and Lynch told police that he had not seen other males in the apartment.

Importantly, the State also presented substantial evidence of flight, which further distinguishes this case from the cases Lynch relies on in his brief. *See State v. Ballenger,* 322 S.C. 196, 200, 470 S.E.2d 851, 854 (1996) ( "[F]light . . . is at least some evidence of guilt."); *State v. Pagan,* 369 S.C. 201, 209, 631 S.E.2d 262, 266 (2006) ("Flight evidence is relevant when there is a nexus between the flight and the offense charged."). As previously stated, when Lynch was stopped for speeding in Texas two days after the victims were last seen, he was driving Portia's car and he told the officer he was traveling to

Arizona to see his wife, although he was not married. He checked into hotels in multiple states over a short period where he paid cash, once using a false address. He was stopped while trying to enter Canada a few days later, claiming he wanted to visit Vancouver to "see bears." He also repeatedly lied to police officers, initially claiming he had not driven Portia's car outside South Carolina and only admitting to it after he was confronted with evidence of his traffic stop in Texas. Finally, the State presented evidence that Lynch abandoned Portia's car in Seattle, removing the license plate and all identification. *See State v. Beckham,* 334 S.C. 302, 314, 513 S.E.2d 606, 612 (1999) ("The attempted destruction of evidence is regarded as a relevant incriminating circumstance."). Viewing this evidence in a light most favorable to the State, the evidence rose above mere suspicion and constituted substantial circumstantial evidence to prove Lynch was guilty of grand larceny of Portia's car and the victims' murders. *Cf. Mitchell,* 341 S.C. at 409, 535 S.E.2d at 127 (recognizing a motion for directed verdict should be granted "where the evidence merely raises a suspicion that the accused is guilty"). Accordingly, the trial court did not err in denying Lynch's motion for a directed verdict.

## II. Jury Instruction

Lynch next argues the trial court erred in not giving a jury instruction regarding how to use and evaluate circumstantial evidence.[3] We disagree.

 "An appellate court will not reverse the trial [court]'s decision regarding a jury charge absent an abuse of discretion." *State v. Commander,* 396 S.C. 254, 270, 721 S.E.2d 413, 421–22 (2011) (internal quotation marks omitted). "To warrant reversal, a trial [court]'s refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Id.* at 270, 721 S.E.2d at 422 (internal quotation marks omitted). "A jury charge which is substantially correct

---

**3.** Because Lynch received a bench trial, he did not actually request a jury instruction; rather, he requested the trial court consider the "correct" law when evaluating whether there was substantial circumstantial evidence of guilt.

and covers the law does not require reversal." *State v. Brandt,* 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011).

At the conclusion of the case, the parties engaged in a charge conference to discuss the standards the trial court would use to evaluate the evidence. Lynch moved for a circumstantial evidence charge found in *State v. Edwards;*[4] specifically, that "in a circumstantial evidence case, if the factfinder w[ere] to view any story that was plausible without the absence of direct evidence, they should find him not guilty. Circumstantial evidence has to be complete."

Lynch argued that due to the nature of a capital proceeding, where the Eighth Amendment required heightened reliability, the appropriate charge would be "the old *Edwards* standard, which is any exception that would tend to disprove the case is sufficient to defeat the case." The trial court stated it would not "charge something that [was] not the law" and denied Lynch's request.

In *Edwards,* the supreme court approved the following charge as part of an appropriate circumstantial evidence charge:

> every circumstance relied upon by the State [must] be proven beyond a reasonable doubt; and ... all of the circumstances so proven [must] be consistent with each other and taken together, point conclusively to the guilt of the accused to the exclusion of every other reasonable hypothesis. It is not sufficient that they create a probability, though a strong one and if, assuming then to be true they may be accounted for upon any reasonable hypothesis which does not include the guilt of the accused, the proof has failed.

298 S.C. at 275, 379 S.E.2d at 889 (quoting *State v. Littlejohn,* 228 S.C. 324, 328, 89 S.E.2d 924, 926 (1955) (alteration in original)).

In *State v. Grippon,* our supreme court found the trial court did not err when it refused to charge the phrase "to the exclusion of every other reasonable hypothesis" in its circumstantial evidence jury charge. 327 S.C. 79, 82, 489 S.E.2d 462,

---

4. 298 S.C. 272, 379 S.E.2d 888 (1989), *abrogated by State v. Logan,* 405 S.C. 83, 747 S.E.2d 444 (2013).

463 (1997), *abrogated by State v. Cherry,* 361 S.C. 588, 606
S.E.2d 475 (2004). The supreme court held that in a criminal
case relying in whole or in part on circumstantial evidence,
once a proper reasonable doubt instruction is given, the jury
should be instructed as follows:

> There are two types of evidence which are generally pre-
> sented during a trial—direct evidence and circumstantial
> evidence. Direct evidence is the testimony of a person who
> asserts or claims to have actual knowledge of a fact, such as
> an eyewitness. Circumstantial evidence is proof of a chain
> of facts and circumstances indicating the existence of a fact.
> The law makes absolutely no distinction between the weight
> or value to be given to either direct or circumstantial
> evidence. Nor is a greater degree of certainty required of
> circumstantial evidence than of direct evidence. You should
> weigh all the evidence in the case. After weighing all the
> evidence, if you are not convinced of the guilt of the
> defendant beyond a reasonable doubt, you must find [the
> defendant] not guilty.

*Id.* at 83–84, 489 S.E.2d at 464.

Justice Toal wrote a concurrence, finding no reason to adopt
an entirely new circumstantial evidence charge and recom-
mending trial courts not abandon "South Carolina's traditional
charge as described in *State v. Edwards.*" *Id.* at 84–85, 489
S.E.2d at 464–65 (Toal, J., concurring). Justice Toal opined
juries need "detailed information about the relation of circum-
stantial evidence to determination of guilt" and "the *Edwards*
charge clarifies the jury's responsibility to evaluate circum-
stantial evidence carefully." *Id.* at 88, 489 S.E.2d at 466–67.

In *State v. Cherry,* the defendant argued the trial court
erred in refusing to give the *Edwards* charge. 361 S.C. at
595, 606 S.E.2d at 478–79. The supreme court disagreed,
holding "*Grippon* is the sole remaining charge to be utilized
by the courts of this state in instructing juries in cases relying,
in whole or in part, on circumstantial evidence." *Id.* at 597,
606 S.E.2d at 480. Specifically, the court found,

> [T]he reasonable hypothesis charge merely serves to con-
> fuse juries by leading them to believe that the standard for
> measuring circumstantial evidence is different than that for
> measuring direct evidence when, in fact, it is not. The

standard remains whether the evidence reflects proof of the defendant's guilt beyond a reasonable doubt. Accordingly, we hold that the recommended language in *Grippon* is the sole and exclusive charge to be given in circumstantial evidence cases in this state, along with a proper reasonable doubt instruction.

*Id.* at 601, 606 S.E.2d at 482 (footnotes omitted).

In *State v. Logan*, the supreme court held trial courts should provide the following language as a circumstantial evidence charge, in addition to a proper reasonable doubt instruction, when requested by the defendant:

There are two types of evidence which are generally presented during a trial—direct evidence and circumstantial evidence. Direct evidence directly proves the existence of a fact and does not require deduction. Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence of a fact.

Crimes may be proven by circumstantial evidence. The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence, however, to the extent the State relies on circumstantial evidence, all of the circumstances must be consistent with each other, and when taken together, point conclusively to the guilt of the accused beyond a reasonable doubt. If these circumstances merely portray the defendant's behavior as suspicious, the proof has failed.

The State has the burden of proving the defendant guilty beyond a reasonable doubt. This burden rests with the State regardless of whether the State relies on direct evidence, circumstantial evidence, or some combination of the two.

405 S.C. at 99, 747 S.E.2d at 452. The court further noted, "This holding does not prevent the trial court from issuing the circumstantial evidence charge provided in *Grippon* and *Cherry*. However, trial courts may not exclusively rely on that charge over a defendant's objection." *Id.* at 100, 747 S.E.2d at 452–53. Nevertheless, the *Logan* court ultimately concluded any error in the trial court's jury instructions was harmless beyond a reasonable doubt because the trial court "clearly instructed the jury regarding the reasonable doubt burden of

proof" and its jury instruction, "as a whole, properly conveyed the applicable law." *Id.* at 94 n. 8, 747 S.E.2d at 449 n. 8 (citations omitted).

The trial court did not err in refusing to issue Lynch's requested jury charge. Initially, we note that the *State v. Logan* decision applies to this case because Lynch's direct appeal was pending when *Logan* was released. *See State v. Jenkins,* 408 S.C. 560, 572, 759 S.E.2d 759, 765 (Ct.App.2014), *cert pending* (finding *Logan* applies to cases "pending on appeal at the time the *Logan* opinion was published"). Nevertheless, we believe Lynch's argument is without merit because his requested circumstantial charge was based on the "reasonable hypothesis" language from *Edwards,* which the supreme court found unnecessary in *Logan. See Logan,* 405 S.C. at 99, 747 S.E.2d at 452; *Jenkins,* 408 S.C. at 572–73, 759 S.E.2d at 766 ("Our supreme court has excluded the 'reasonable hypothesis' language from the circumstantial evidence instruction now required by *Logan,* recognizing that this language is unnecessary."). Therefore, the trial court did not commit reversible error in refusing Lynch's requested charge. *See State v. Drayton,* 411 S.C. 533, 769 S.E.2d 254 (App.2015) (Shearouse Adv. Sh. No. 5 at 48, 51) (finding no reversible error in trial court's failure to include the *Edwards* "reasonable hypothesis" language in its circumstantial evidence jury charge when the trial court's instruction "as a whole, properly conveyed the applicable law").

## III. Search and Seizure

Lynch next argues the trial court erred in not suppressing evidence seized in connection with his arrest because his arrest warrant for grand larceny was not supported by probable cause. Relying on *Franks v. Delaware,*[5] Lynch argues the officer who obtained the arrest warrant for grand larceny failed to inform the magistrate that Lynch and Portia were in a relationship, had lived together, and that Lynch had previously driven Portia's car. He asserts that but for these omissions, the arrest warrant for grand larceny would not have been supported by probable cause. We disagree.

---

5. 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

"There is ... a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks*, the Supreme Court of the United States held the Fourth and Fourteenth Amendments gave a defendant the right in certain circumstances to challenge the veracity of a warrant affidavit after the warrant had been issued and executed. *Id.* at 155–56, 98 S.Ct. 2674.

> To be entitled to a *Franks* hearing for an alleged omission, the challenger must make a preliminary showing that the information in question was omitted with the intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge. There will be no *Franks* violation if the affidavit, including the omitted data, still contains sufficient information to establish probable cause.

*State v. Missouri*, 337 S.C. 548, 554, 524 S.E.2d 394, 397 (1999) (footnote omitted). "*Franks* addressed an act of *commission* in which false information had been included in the warrant affidavit. However, the *Franks* test also applies to acts of *omission* in which exculpatory material is left out of the affidavit." *Id.* "Entitlement to a *Franks* hearing is a matter of law subject to *de novo* review." *Horton v. City of Columbia*, 408 S.C. 27, 36, 757 S.E.2d 537, 541 (Ct.App.2014), *cert granted.*

> While omissions may not be *per se* immune from inquiry, the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory. This latter situation potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. The potential for endless rounds of *Franks* hearings to contest facially sufficient warrants is readily apparent.

*United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990) (citations omitted).

A party attempting to demonstrate information was intentionally or recklessly omitted from an affidavit bears a heavy burden of proof. *United States v. Tate*, 524 F.3d 449, 454 (4th Cir.2008). "[T]he omission must be 'designed to

mislead' or must be made 'in reckless disregard of whether [it] would mislead.'" *Id.* at 455 (citation omitted) (emphasis removed) (second alteration in original). "The defendant must also show that the omitted material was necessary to the finding of probable cause, *i.e.,* that the omitted material was such that its inclusion in the affidavit would defeat probable cause." *United States v. Shorter,* 328 F.3d 167, 170 (4th Cir.2003) (citations and internal quotation marks omitted). "Upon making this two-part preliminary showing, a defendant is entitled to a hearing, at which he bears the burden of proving the allegations by a preponderance of the evidence." *Id.* "If a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *Colkley,* 899 F.2d at 300.

## A. Border Search

During Lynch's detention at the United States/Canada border, Agent Bresee found several items in Lynch's possession, including a Greyhound bus ticket from Seattle to Vancouver dated June 17, 2006; a Motel 6 receipt dated June 14, 2006; and a second Motel 6 receipt dated June 12, 2006. Agent Bresee faxed copies of these items to WCPD, and at 3:10 a.m. on June 18, 2006, WCPD confirmed to him that an arrest warrant had been issued for Lynch on the charge of grand larceny. Agent Bresee then called the Whatcom County, Washington Sheriff's Department to take Lynch into custody, and a sheriff's deputy served Lynch with an arrest warrant for grand larceny.

Following Bresee's testimony, Lynch moved to suppress the seizure of the documents by the border patrol agents and their subsequent transfer to WCPD. Lynch, however, conceded that he did not "have a problem with the Border Patrol agent checking into [Lynch]. There's an NCIC for a missing person. He checks his bags. If he checked them at that point, that's okay, too." The trial court denied Lynch's motion to suppress, finding the documents were seized lawfully under the border exception to the Fourth Amendment and that the documents were lawfully transmitted to WCPD "because they

were seized properly and lawfully under the Border Patrol's authority."

Initially, we note that the trial court did not err in refusing to suppress the items seized by the border patrol. Lynch conceded the initial search of his bags by the border patrol was valid; therefore, any argument that his initial search was unlawful is unpreserved. Even if the argument is preserved, it is without merit because the contents of Lynch's luggage were lawfully seized under the border exception to the Fourth Amendment. *See United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) ("[S]earches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border. . . ."). Furthermore, once the items were properly seized by the border patrol agents, the agents could fax copies of those items to WCPD. *See Illinois v. Andreas*, 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all."); *State v. Muquit*, 381 S.C. 114, 118, 671 S.E.2d 643, 645 (Ct.App. 2009) ("When an arrestee's property is already in the custody of law enforcement as an incident of the arrest, the police may seize it at a later time as evidence relating to his offense."). Therefore, the trial court did not err in refusing to suppress the items seized during Lynch's search at the border.

## B. Arrest Warrant/ *Franks* Hearing

Lynch next moved to suppress any evidence seized from him after his arrest for grand larceny, arguing his arrest warrant for grand larceny was invalid. Detective Matt Edwards of WCPD testified he procured Lynch's arrest warrant for grand larceny on June 18, 2006. Detective Edwards supplemented the affidavit for the warrant with sworn testimony to the magistrate. He orally "reiterated that [WCPD] knew the vehicle belonged to Portia, and Portia alone, through [the] DMV," that Lynch "would not have been allowed to take the vehicle at any time" based upon conversations with co-workers and family, that Lynch lied to the trooper in Texas when he said he was going to pick up his wife in Arizona

because Lynch was unmarried, and that Lynch showed up in Washington alone.

On cross-examination, Detective Edwards testified he "passed on to [the magistrate] ... what had been openly discussed ... by coworkers and family, that [Lynch] would not have been allowed to" drive Portia's car. He further stated that at that time, he had not talked to Portia's mother and he "had seen no documents that indicated [Lynch and Portia] were husband and wife." Detective Edwards admitted he did not tell the magistrate (1) that Lynch and Portia had lived together in different residences for two years, (2) that they had an intimate relationship, and (3) that Portia was Lynch's live-in girlfriend.

Thereafter, Lynch argued Detective Edwards's omissions of information in the process of obtaining the warrant rendered the warrant defective. Lynch asserted the manner the warrant was presented to the magistrate implied that Lynch was a "random person" driving Portia's car when in fact he was her live-in boyfriend who had previously driven her car with permission. Specifically, Lynch argued that Detective Edwards failed to inform the magistrate that Lynch was driving a car that belonged to his live-in girlfriend of two years and that coworkers and family members informed police that Lynch would occasionally drive Portia's car.

The trial court ruled that even with the omitted information—that Lynch and the victim had been in a relationship but the relationship was troubled—the arrest warrant still was supported by probable cause. It found that "based upon the information that [WCPD] detectives had at that time," the information they presented to the magistrate was sufficient to establish probable cause. The court acknowledged that "certain facts [were] left out"; however, it denied any motion to suppress based on the allegation that the arrest warrant was not supported by probable cause.

Lynch has failed to show a *Franks* violation. First, Detective Edwards did not recklessly or intentionally omit the information that was not relayed to the magistrate. *See Missouri*, 337 S.C. at 554, 524 S.E.2d at 397 ("To be entitled to a *Franks* hearing for an alleged omission, the challenger must make a preliminary showing that the information in

question was omitted with the intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge."). Lynch asserts that Detective Edwards recklessly or intentionally failed to inform the magistrate that Jones had seen Lynch driving Portia's car; however Detective Edwards testified that at the time he obtained the warrant, he had not spoken with Jones; therefore, he could not have conveyed this information to the magistrate. In addition, Detective Edwards stated that at that time, he "had seen no documents that indicated [Lynch and Portia] were husband and wife." Thus, he could not have informed the magistrate that Lynch and Portia's apartment lease indicated they were married. Accordingly, Lynch has not shown a *Franks* violation because he failed to make a preliminary showing that Detective Edwards intentionally or recklessly omitted the alleged exculpatory information.

■ Even if Detective Edwards acted recklessly in omitting this information, Lynch has still failed to show a *Franks* violation because the affidavit, including the omitted information, and Detective Edwards's oral testimony before the magistrate provided probable cause that Lynch was guilty of grand larceny. *See id.* ("There will be no *Franks* violation if the affidavit, including the omitted data, still contains sufficient information to establish probable cause."). The arrest warrant affidavit stated:

[Detective Edwards] further state[s] that there is probable cause to believe that [Lynch] did commit [grand larceny] and that probable cause is based on the following facts: In that on or about June 14th, 2006, at 200 N. 12th Street, in the city of West Columbia, County and State aforesaid, [the victims] were reported missing to the West Columbia Police Department. They had not been seen by anyone since June 10, 2006. On June 14th, 2006[,] [Lynch] was ticketed in El Paso, Texas, while driving alone in a 2005 Ford Focus (VIN Number 1FAFP34N25W228072) valued at $12,000.00 which is registered to [Portia]. On June 18, 2006, [Lynch] was stopped while trying to cross the USA/Canadian [b]order on a bus. The whereabouts of the vehicle are unknown. Investigators with [WCPD] believe that [Lynch] did take, steal, and carry away the vehicle depriving the owner of its use and value. All of which

constitutes the crime of grand larceny more than $5000.00 and is in violation of the South Carolina Code of Laws of 1976 as Amended.

In addition, Detective Edwards properly supplemented the affidavit with sworn oral testimony before the magistrate. *See State v. Crane,* 296 S.C. 336, 338, 372 S.E.2d 587, 588 (1988) ("[A] search warrant affidavit insufficient in itself to establish probable cause may be supplemented before a magistrate by sworn oral testimony."). Specifically, he told the magistrate "that [WCPD] knew the vehicle belonged to Portia, and Portia alone, through [the] DMV," that Lynch "would not have been allowed to take the vehicle at any time" based upon conversations with coworkers and family, that Lynch lied to the trooper in Texas when he said he was going to pick up his wife in Arizona because Lynch was unmarried, and that Lynch showed up in Washington alone. Even including the omitted information that Lynch and Portia were in an intimate relationship and had been living together for several years, the information would have also revealed that the relationship was troubled. Moreover, the omitted information would not have explained or negated the fact that at the time WCPD sought the arrest warrant, Portia had been reported missing for four days, and Lynch had been stopped in Texas alone driving a car that was registered to Portia. While evidence of a prior relationship might have offered an innocent explanation for Lynch's use of Portia's car, the exculpatory impact of this evidence was greatly diminished by the fact that Lynch was seen driving the car alone in Texas, and he arrived in Washington by bus without Portia. Further, the magistrate would have still known that the vehicle had not been located, and DMV records indicated that the vehicle belonged to Portia. Accordingly, the trial court did not err in not suppressing evidence seized during Lynch's arrest because the arrest warrant was valid and supported by probable cause.

## CONCLUSION

Based on the foregoing, the trial court is

**AFFIRMED.**

SHORT and McDONALD, JJ., concur.