775 S.E.2d 39

**The STATE, Respondent,**

v.

**Brenda BRATSCHI, Appellant.**

**Appellate Case No. 2012–211980.**

**No. 5327.**

Court of Appeals of South Carolina.

Heard Feb. 3, 2015.

Decided July 15, 2015.

98

100

Appellate Defender, David Alexander, of Columbia, for appellant.

Attorney General, Alan McCrory Wilson, Chief Deputy Attorney General, John W. McIntosh, Senior Assistant Deputy Attorney General, Donald J. Zelenka, and Assistant Attorney General, Kaycie Smith Timmons, all of Columbia, and Solicitor Edgar Lewis Clements, III, of Florence, for respondent.

KONDUROS, J.

Brenda Bratschi appeals her convictions of murder and burying a body without notice, arguing the trial court erred in failing to grant her a directed verdict. She also contends the trial court erred in admitting a 911 call into evidence. We affirm.

## FACTS/PROCEDURAL HISTORY

On October 21, 2004, Investigator Michael Rhodes responded to a domestic violence call.[1] While he was on the way to the scene, he was redirected to the Coward Police Department, where one of the callers, Brenda, was located. Brenda

---

1. Both parties to the dispute called 911. State's Exhibit 24 contained both of the calls.

told Investigator Rhodes she and her husband, Randy Bratschi, were at their home walking to their car to go to a credit union in Coward. According to Brenda, when she looked behind her, she saw Randy approaching her with a garden hoe in his hand. She stated he struck her on the hand and she grabbed a wooden tire thumper [2] and began hitting him to get him away from her. Brenda had a small laceration on her thumb.

Investigator Rhodes then went to the Lake City emergency room, where Randy was being attended to after authorities responded to his trailer because of his 911 call. Randy's face was swollen and had lacerations on it. He also had bruising on his chest, a skull fracture, and other injuries to his head. Dr. Ernest Atkinson treated Randy at the hospital, where he stayed for several days. Dr. Atkinson described the injuries as "pretty severe" but not life threatening. He stated that if one of the blows had been to the back of Randy's head instead of the front or side, it could have killed him.

Investigator Paul Byrd with the Florence County Sheriff Office's crime scene unit investigated the Bratschis' home and yard. He collected six guns and multiple boxes of ammunition from the home as well as another gun from Randy's boat. Investigator Kathleen Streett also investigated Randy and Brenda's altercation. Randy admitted to wielding a garden hoe but claimed he was only trying to get away from Brenda. At the time of the incident, Randy's bank account was overdrawn due to withdrawals by Brenda. Investigator Streett believed Randy was "terrified" of Brenda. Randy obtained a restraining order against Brenda from the family court because of the altercation. Investigator Streett charged Brenda with assault and battery with intent to kill.[3] After the protection order hearing, Randy visited Brenda to retrieve his black Isuzu Rodeo he previously had allowed her to drive.

Kathy Merrill and her husband, Russell Merrill, were longtime friends with Randy. They became friends with Brenda a few years before the altercation when Brenda and Randy

---

**2.** A tire thumper is used by truck drivers to check the air in their tires and looks like a small wooden baseball bat.

**3.** Those charges were still pending at the time of the murder trial.

began dating. Kathy testified Randy and another friend, Susan Hill, began dating after Randy and Brenda's altercation. Kathy also stated that sometime after the altercation Brenda told her she had hired a private investigator who took pictures of Randy and Susan. Kathy further testified Randy previously had a gun stolen from his home.

Susan testified she and Randy began dating after his altercation with Brenda. She indicated that after she and Randy began dating, she returned to her house one time and found a light on, a door ajar, and her inside dog outside; she had left the doors locked and the light off. Kathy and Susan both testified that shortly after the incident, they went to Randy's trailer to clean it for him. They found the door locked even though Randy left it unlocked for them.

On November 26, 2004, the Friday after Thanksgiving, Randy had plans to go to a turkey shoot with friends. He clocked out of work just before 7:00 a.m. that day. When his friends arrived at his home to pick him up, he did not answer the door. Randy's Isuzu Rodeo was there; however, Randy's truck and boat were not.[4] Randy's dog was inside the trailer. A makeshift alarm system Randy set up after the incident with Brenda was not set. The following day, Randy did not come to Russell's house for oysters like they had planned. Randy was scheduled to work special shifts on Saturday and Sunday but did not report to work. Brenda and Susan both called Russell's home looking for Randy that weekend. Russell contacted the police on Sunday about Randy. Brenda also contacted police to report him missing.

The police searched Randy's property and trailer. They found Randy's blood glucose meter at the home, which was last used on Thanksgiving at 5:47 p.m., before he went to work. They did not find anything under his trailer. The police used cadaver dogs, which did not discover anything.

---

4. Frankie Miles, Brenda's seventeen-year-old son, lived with Randy and Brenda before their altercation. Russell believed Frankie had borrowed the truck and boat to go fishing. Investigator Phillip Hanna testified he verified Frankie was on a fishing or hunting trip several hundred miles away the Friday Randy went missing.

Several witnesses saw a dark Isuzu Rodeo at a public boat landing on the Pee Dee River in Pamplico [5] over Thanksgiving weekend, beginning on Friday afternoon, and thought it looked like it had not moved. Officer Robbie Stone testified he ran the tag on the vehicle at the landing on Saturday night at 8:03 p.m. but it did not come back as stolen. Donald Huggins of the Florence County Sheriff's Office testified someone stopped by his farm on Sunday afternoon and told him a suspicious looking black SUV was at the landing. He called into the Sheriff's Office to have someone check the vehicle. Investigator Rhodes testified he observed a black vehicle at the landing on Sunday at 5:00 p.m. and ran the tags. Investigator Alvin Powell testified he observed a small dark SUV at the landing on the Monday following Thanksgiving and ran the tags but it was not stolen.

On the Tuesday following Thanksgiving, Investigator Streett entered the Isuzu into the National Crime Information Computer (NCIC) as belonging to a missing person. On December 1, 2004, the Wednesday following Thanksgiving, Deputy Brad Bazen ran the plates on the Isuzu through NCIC, and it indicated the car belonged to a missing person, Randy. An envelope containing $900 in $100 denominations was found in the driver's seat during a search of the vehicle. Small spots of Brenda's blood were found on the steering wheel, steering wheel column, dashboard, and gearshift of the Isuzu. The blood spots were later determined to be several days to one week old. No usable fingerprints were found inside of the vehicle, and a body did not appear to have been transported in the back of the vehicle. The car did not appear to have been hotwired. Police searched the area around the vehicle and the river but found nothing.

Jerome Eaddy lived near the boat landing. The Friday after Thanksgiving, he returned home after work sometime after 11:00 p.m. He observed someone walking alongside the road. The person went to his neighbor's house and then came to his house. Eaddy later identified the person as Brenda. Brenda told him she needed a ride home. Eaddy and his mother gave Brenda a ride to Coward. They dropped her off at a trailer home development near Randy's trailer. Eaddy

---

5. Randy sometimes drove to the landing "to get away from things."

was not certain which night around Thanksgiving he gave Brenda a ride. Eaddy did not believe Brenda was nervous, angry, crying, or bleeding and thought she seemed calm. The police later searched parts of Brenda's family farm because it was near where Eaddy took her but only found a rectangular hole recently dug near a deer stand, which was about a quarter of a mile from Randy's home. Investigator Hanna believed the hole resembled a grave.

William Rauch, a friend of Brenda and Randy, saw Brenda leaving Randy's property during daylight hours on either the Friday or Saturday after Thanksgiving. He stated Brenda was driving her car, which was "a little brown tannish car." Another friend of Randy, Edward Jeffcoat, testified he visited Randy to get lifejackets from him on the morning of Thanksgiving or the next day.

Brenda did not move back into Randy's home[6] once the protection order expired. On July 16, 2009, after Marty McDonald had purchased Randy's property at a tax sale, he was having the trailer removed from the land. McDonald noticed something under the trailer he initially thought was a gourd. After looking closer, he determined it was a human skull. McDonald contacted the police, who recovered skeletal remains, clothing, and a pair of boots. The body was found inside a blue tarp buried in a shallow grave that varied in depth from eight to eighteen inches deep. DNA testing concluded the skeleton was Randy. The Florence County Sheriff's Office, crime scene investigators, and a forensic anthropologist were all unable to make a determination as to how, when, or where Randy had died.

Brenda was arrested on December 7, 2009, for Randy's murder. In June 2010, a grand jury indicted Brenda for murder and burying a body without notice.[7] During trial, the State introduced the 911 calls. Brenda objected to Randy's call being played, arguing it violated the Confrontation Clause of the Sixth Amendment and was unfairly prejudicial under

---

6. There was no mortgage on the home.

7. Frankie was charged with misprision of a felony for giving deceptive and false information to police during the investigation of a felony.

Rule 403, SCRE.[8] The trial court overruled the objection. Brenda moved for a directed verdict at the close of the State's case, which the trial court denied.

Heath Matthews, Brenda's nephew, testified Brenda moved in with his mother, his father, and him once Randy obtained the restraining order against her. He also testified he heard Frankie talking to Randy on the phone the Saturday after Thanksgiving while they were returning from their fishing and hunting trip. He estimated the call lasted three to four minutes. On cross-examination, Heath indicated he had only met Randy once but had talked to him on the phone before. Dennis Matthews, another nephew of Brenda, testified he saw Randy driving his Isuzu between 3:00 and 3:30 p.m. on the Sunday after Thanksgiving. Dennis testified he had never met Randy but had seen him before. Brenda's uncle, William Miles, testified he also saw Randy the Sunday after Thanksgiving driving the Isuzu. Brenda also called Frankie as a witness but he asserted his Fifth Amendment rights instead of answering any questions. Brenda renewed her motion for a directed verdict at the close of her case, which the trial court again denied.

The jury convicted her of both counts. The trial court sentenced her to life imprisonment for murder and three years' imprisonment for the burial charge, with credit for time served. This appeal followed.

## LAW/ANALYSIS

### I. Directed Verdict

Brenda maintains the trial court erred in denying her motion for a directed verdict because the State did not present evidence of how, when, or where the victim was killed and the evidence the State did present did not amount to substantial circumstantial evidence. We disagree.

"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). When reviewing a trial court's denial of a defendant's motion for a directed verdict, an

---

**8.** Brenda had objected to the tape on the same grounds during a motion in limine.

appellate court must view the evidence in a light most favorable to the State. *State v. Venters,* 300 S.C. 260, 264, 387 S.E.2d 270, 272 (1990). Additionally, an appellate court must find a case was properly submitted to the jury if any direct evidence or any substantial circumstantial evidence reasonably tends to prove the guilt of the accused. *Weston,* 367 S.C. at 292–93, 625 S.E.2d at 648. "A case should be submitted to the jury when the evidence is circumstantial if there is any substantial evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced." *State v. Bostick,* 392 S.C. 134, 139, 708 S.E.2d 774, 776 (2011) (internal quotation marks omitted). "[T]he trial court should grant a directed verdict motion when the evidence presented merely raises a suspicion of guilt." *Id.* at 142, 708 S.E.2d at 778. "Circumstantial evidence . . . gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury." *State v. Rogers,* 405 S.C. 554, 567, 748 S.E.2d 265, 272 (Ct.App.2013).

In *State v. Frazier,* 386 S.C. 526, 532, 689 S.E.2d 610, 613 (2010), the appellant "cite[d] to *State v. Arnold,* 361 S.C. 386, 605 S.E.2d 529 (2004), *State v. Martin,* 340 S.C. 597, 533 S.E.2d 572 (2000), and *State v. Schrock,* 283 S.C. 129, 322 S.E.2d 450 (1984)[,] for the proposition that the trial court must grant a directed verdict if the State fails to present evidence placing the defendant at the scene of the crime." The court found the appellant

overstates the holdings in these cases. In *Arnold, Martin,* and *Schrock* [,] we held that the State did not produce substantial circumstantial evidence of the defendant's guilt and noted that the State presented *no* evidence that the defendant was at the scene. We reject any interpretation that these cases altered or increased the sufficiency of evidence standard a trial court is to apply in a case based on circumstantial evidence. In this case, unlike *Arnold, Martin,* and *Schrock,* the State offered substantial circumstantial evidence of Frazier's guilt.

*Frazier,* 386 S.C. at 532, 689 S.E.2d at 613.

In *State v. Miller,* the appellant "argue[d] *Schrock* is on point because no direct evidence placing him at the crime

scene was presented." 287 S.C. 280, 284, 337 S.E.2d 883, 885 (1985), *overruled on other grounds by State v. Edwards,* 298 S.C. 272, 379 S.E.2d 888 (1989). The *Miller* court found "*Schrock,* however, is distinguishable, standing for the simple proposition that a conviction will not stand where there is a complete absence of any competent evidence. *Schrock* will not be interpreted to impossibly increase the State's burden regarding cases relying solely on circumstantial evidence." *Id.*

■ "[A] directed verdict is not required merely because the State cannot conclusively show the defendant was at the crime scene at the relevant time." *Rogers,* 405 S.C. at 568, 748 S.E.2d at 273. In *Rogers,* this court found the *Frazier* court explained the *Arnold, Martin,* and *Schrock* "holdings were based on the State's failure to present *any* evidence placing the defendant at the scene, not the State's inability to provide conclusive proof on that point." *Rogers,* 405 S.C. at 568–69, 748 S.E.2d at 273.

In *Arnold,* our supreme court held fingerprint evidence placing Arnold with the victim on the day of the murder was not substantial and merely raised a suspicion of Arnold's guilt. 361 S.C. at 390, 605 S.E.2d at 531. The victim's body was discovered off a dirt road in Colleton County. *Id.* at 388, 605 S.E.2d at 530. The victim was last seen alive three days earlier, when he borrowed a friend's car to go to an appointment. *Id.* A witness testified he had introduced the victim to Arnold. *Id.* The witness also indicated that the day after the victim disappeared, he had received a message from Arnold to call him at a phone number belonging to Arnold's father. *Id.* at 389, 605 S.E.2d at 530. The car borrowed by the victim was found in Tennessee, approximately ten miles away from where Arnold's father lived. *Id.* at 389, 390 n. 3, 605 S.E.2d at 530, 531 n. 3. The car had unspecified scratches on it, and a coffee cup lid containing Arnold's fingerprint was found in the car's center console. *Id.* at 389, 605 S.E.2d at 530. In determining the circumstantial evidence presented by the State was not sufficient to overcome a directed verdict motion, the court reasoned:

Viewing the evidence most favorably to the State, [Arnold]'s fingerprint on the coffee cup lid tab establishes he was in the borrowed [car] on the same day the victim was last seen

alive. The fact that the [car] was found abandoned in Tennessee, the same state where [Arnold] was located after his stay in Savannah, raises a suspicion of guilt but is not evidence that [Arnold] killed [the victim]. Further, there is no evidence [Arnold] was at the scene of the crime, which according to the State's theory was in Colleton County.

*Id.* at 390, 605 S.E.2d at 531 (footnote omitted).

In *State v. Bennett,* 408 S.C. 302, 307, 758 S.E.2d 743, 745 (Ct.App.2014), *cert. granted* (Nov. 19, 2014), this court considered whether evidence of Bennett's fingerprint and DNA at the site of a burglary constituted substantial circumstantial evidence. A television, computer, monitor, and keyboard were stolen from a community center. *Id.* at 303–04, 758 S.E.2d at 744. Bennett's fingerprint was discovered on a wall-mounted television in the community room that appeared to have been manipulated by the burglar. *Id.* Additionally, two drops of Bennett's blood were found directly below the location of a missing television in the computer room. *Id.* at 305, 758 S.E.2d at 745. Bennett had frequently visited the center before the crime and spent much of his time in the computer room. *Id.* at 307, 758 S.E.2d at 745. The director of the center testified she did not recall seeing Bennett in the community room, which was solely used for scheduled events. *Id.* at 304–05, 758 S.E.2d at 744. However, the director acknowledged the community room was not always locked or consistently monitored. *Id.*

This court found because the State did not present substantial circumstantial evidence reasonably proving Bennett's guilt, Bennett was entitled to a directed verdict. *Id.* at 307–08, 758 S.E.2d at 746. The court recognized the evidence presented by the State "undoubtedly placed Bennett at the *location where a crime ultimately occurred.*" *Id.* at 307, 758 S.E.2d at 746. However, the court rejected the State's assertion "the evidence placed Bennett *at the scene of the crime.*" *Id.* The court reasoned "the exact locations of the DNA and fingerprint evidence ... d[id] not rise above suspicion" because finding Bennett's DNA and fingerprints in communal areas he frequented before the crime was not "unexpected." *Id.*

In *State v. Pearson,* 410 S.C. 392, 394, 401, 764 S.E.2d 706, 707–08, 711 (Ct.App.2014), *cert. granted* (Mar. 4, 2015), this

court found the evidence tying Pearson to charges arising out of the robbery and beating of a victim and fleeing in the victim's car insufficient. The court found "the most damaging evidence was Pearson's fingerprint on the rear of [the victim's] vehicle." *Id.* at 401, 764 S.E.2d at 711. However, the court acknowledged other evidence showed Pearson had an opportunity to come in contact with the vehicle before the crimes occurred; the victim regularly parked his vehicle in a public lot, and Pearson assisted with a five-day project at the victim's residence. *Id.* (citing *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000) (finding the fingerprint evidence was insufficient to prove the defendant's guilt because testimony was presented the defendant had been in and around the victim's house at least three times before the burglary)). The court noted "the State's fingerprint expert testified she could not determine when the print was placed on the vehicle and that such a print could remain on a vehicle for an indefinite period if left undisturbed." *Id.* The court found, "Because the State offered no timing evidence to contradict reasonable explanations for the presence of the fingerprint, the jury could only have guessed the fingerprint was made at the time of the crimes." *Id.* at 401–02, 764 S.E.2d at 711 (citing *State v. Buckmon*, 347 S.C. 316, 322–23, 555 S.E.2d 402, 405 (2001) (holding a defendant was entitled to a directed verdict when none of the evidence presented by the State placed the defendant at the crime scene and the jury was left to speculate as to the defendant's guilt)).

In *Bostick*, 392 S.C. at 137–38, 708 S.E.2d at 775–76, Roger Bostick was convicted of the murder of his mother's neighbor, Sarah Polite. Polite's house was set on fire, and her body was found in her house. *Id.* at 136–37, 708 S.E.2d at 775. She had been struck in the head with a blunt force object but actually died as a result of carbon monoxide from the fire. *Id.* at 136, 708 S.E.2d at 775. The supreme court found:

[T]he following pieces of circumstantial evidence of [Bostick's] guilt had been presented: (1) Polite's car keys, calculator, and other items from her home were found in the Bostick family's burn pile; (2) the fire in the burn pile was accelerated with either kerosene or diesel fuel, and Bostick's mother did not use those accelerants when she burned things in the pile; (3) Bostick had a pattern that matched

gasoline on his shoes and gasoline was the accelerant used for the house fire; and (4) while the DNA from the blood found on Bostick's jeans excluded about ninety-nine percent of the population, the blood could not be matched to Polite's DNA.

*Id.* at 141–42, 708 S.E.2d at 778. The court additionally found:

[T]he weapon used to beat Polite in the head was never introduced into evidence. Finally, no evidence was introduced concerning Bostick's knowledge that Polite may have had money in the briefcase [she typically brought home from church on Sunday with money to deposit at the bank on Monday] or if indeed any money was in the briefcase on that particular Sunday.

*Id.* at 136, 142, 708 S.E.2d at 775, 778. Ultimately, the court concluded:

The evidence presented by the State raised, at most, a mere suspicion that Bostick committed this crime. Under settled principles, the trial court should grant a directed verdict motion when the evidence presented merely raises a suspicion of guilt. Therefore, we find the circuit court erred in failing to direct a verdict in favor of Bostick.

*Id.* at 142, 708 S.E.2d at 778 (citation omitted).

In *State v. Lynch*, 412 S.C. 156, 161, 164–65, 771 S.E.2d 346, 349–51 (Ct.App.2015), Lynch was convicted of the murder of his girlfriend and her granddaughter after they disappeared and he drove his girlfriend's car across the country and tried to cross the border into Canada. The victims' bodies were never found but the granddaughter's blood mixed with blood belonging to a man was discovered in the victims' apartment. *Id.* at 161, 168, 771 S.E.2d at 349, 352–53. The State presented evidence at trial Lynch was the last person seen with the victims at the place where the State alleged the murders occurred. *Id.* at 173, 771 S.E.2d at 355 (citing *State v. Williams*, 303 S.C. 274, 276, 400 S.E.2d 131, 132–33 (1991) (finding "substantial evidence" to prove the defendant's guilt when the victim was employed by the defendant, was last seen alive with the defendant, and the victim's decomposed body was found)); *see also State v. Lane*, 410 S.C. 505, 765 S.E.2d 557 (2014) (per curiam) (finding the State presented substantial circumstantial evidence the defendant was guilty of bur-

glary when a piece of paper with the defendant's name was later found at the crime scene and a car with the same unusual paint as the defendant's was seen in the victim's driveway when the crime occurred). The court found this distinguished the case from *Arnold* in which the victim was last seen alone at his office, and although Arnold's fingerprint was found in the victim's car, the State presented no evidence Arnold was at the scene of the crime. *Lynch,* 412 S.C. at 173, 771 S.E.2d at 355. Moreover, Lynch admitted to police he last saw his girlfriend on the day before the State alleged the murder occurred. *Id.* Additionally, the State presented forensic evidence an assault occurred at the apartment where Lynch lived with the victims. *Id.* Lynch also admitted he did not know anyone who wanted to harm the victims. *Id.* Additionally, the court noted DNA from a male was found in the victims' apartment and Lynch told police he had not seen other males in the apartment. *Id.* The court also took into account the evidence of Lynch's flight. *Id.* at 173–74, 771 S.E.2d at 355.

■ The trial court did not err in denying Brenda's directed verdict motion. Unlike in *Pearson, Bennett,* and *Arnold,* in the present case Brenda's blood was found somewhere unexpected with no reasonable explanation provided. Brenda had not had access to the Isuzu in several weeks. However, the undisputed evidence was that her blood found in the car was at most a week old. Brenda's argument the blood on the steering wheel of the Isuzu was from the argument five weeks earlier was not supported by any evidence or testimony presented at trial and was directly contradicted by the uncontested testimony.

Further, unlike *Bostick,* in the present case the State produced ample evidence of a motive by Brenda. *See State v. Odems,* 395 S.C. 582, 587, 720 S.E.2d 48, 50 (2011) (noting that in *Bostick,* "the State never introduced a motive ... into evidence"); *see also State v. Braxton,* 343 S.C. 629, 636, 541 S.E.2d 833, 837 (2001) ("Prior disputes between the victim and defendant may be relevant to establish the accused's motive for committing the crime and motive may have bearing on the identity of the accused as the perpetrator of the crime."); *State v. Williams,* 321 S.C. 327, 339, 468 S.E.2d 626, 633 (1996) (affirming the denial of a defendant's directed verdict motion when "circumstantial evidence existed from which the jury

could conclude that [the defendant] had the motive, means, and opportunity to perform the homicides"); *State v. Thomas*, 159 S.C. 76, 80–81, 156 S.E. 169, 171 (1930) ("The rule that evidence tending to show motive or absence of motive on the part of accused is relevant and admissible, and that a wide latitude in the admission of this kind of evidence is permissible, are particularly applicable * * * in cases of circumstantial evidence, motive being a circumstance bearing on the identity of the accused as the perpetrator of the crime." (alteration by court) (internal quotation marks omitted)); *State v. Lancaster*, 167 Ohio St. 391, 149 N.E.2d 157, 162 (1958) ("In doubtful cases the element of motive may be quite material in the determination of the guilt or innocence of the accused." (internal quotation marks omitted)). Also in *Bostick*, while blood was found on Bostick's clothing, it could not be identified as Polite's although 99% of the population was excluded. 392 S.C. at 142, 708 S.E.2d at 778. Whereas Brenda's blood was positively identified as being on the steering wheel of the Isuzu, which she no longer had access to, she was seen near the place the Isuzu was left around the time Randy disappeared, and she was also seen at Randy's home around the time of his disappearance even though the restraining order barred her from going there.

Although all of the evidence against Brenda is circumstantial, we find in viewing the evidence in the light most favorable to the State, the amount of that evidence rises to the substantial level. The following evidence implicates Brenda in Randy's murder: (1) Brenda and Randy violently fought several weeks before his disappearance, with Randy being admitted to the hospital for severe injuries; (2) Brenda was charged with assault and battery and Randy was the victim and sole witness; (3) Randy had obtained a restraining order against Brenda as a result of the fight and Brenda violated that order on several occasions; (4) Brenda confronted Randy and others about his dating Susan; (5) Randy's Isuzu was found away from his home after his disappearance; (6) a small amount of Brenda's blood was on the steering wheel and was a week old at the most, despite her not being allowed to have the Isuzu after the restraining order was obtained; (7) around the time of Randy's disappearance, Brenda got a ride from a stranger near where the Isuzu was found and was dropped off near

Randy's trailer; (8) Brenda was seen at Randy's trailer around the time of his disappearance despite the restraining order; and (9) a grave-like hole was dug on Brenda's family's property less than a quarter mile from Randy's home. Combined together, viewed in the light most favorable to the State, these events arise to the level of substantial circumstantial evidence. Therefore, the trial court did not err in denying Brenda's directed verdict motion.

## II. Confrontation Clause

Brenda argues the trial court violated her rights under the Confrontation Clause of the Sixth Amendment by admitting Randy's 911 call into evidence because it contained testimonial evidence and the unfairly prejudicial nature of the evidence outweighed its probative value. We disagree.

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.; see also State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004) ("The admission or exclusion of evidence ... will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice."). "The admission or exclusion of testimonial evidence falls within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent abuse resulting in prejudice." *State v. Holder*, 382 S.C. 278, 288, 676 S.E.2d 690, 696 (2009) (internal quotation marks omitted).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Rule 403, SCRE. "A trial judge's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances. We review a trial judge's decision regarding Rule 403 pursuant to the abuse of discretion standard and are obligated to give great deference to the trial court's judgment." *State v. McLeod*, 362 S.C. 73, 81–82, 606 S.E.2d 215, 220 (Ct.App.2004) (citations omitted).

"Unfair prejudice means an undue tendency to suggest decision on an improper basis." *State v. Wiles*, 383 S.C. 151, 158, 679 S.E.2d 172, 176 (2009). "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *State v. Dennis*, 402 S.C. 627, 636, 742 S.E.2d 21, 26 (Ct.App.2013) (internal quotation marks omitted). "Evidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis, such as an emotional one." *State v. Cheeseboro*, 346 S.C. 526, 547, 552 S.E.2d 300, 311 (2001). "All evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." *State v. Gilchrist*, 329 S.C. 621, 630, 496 S.E.2d 424, 429 (Ct.App. 1998) (brackets and internal quotation marks omitted).

[T]he distinction between testimonial and non-testimonial hearsay is significant only in the context of determining whether there has been a Sixth Amendment Confrontation Clause violation. The Supreme Court has held testimonial hearsay against a defendant violates the Confrontation Clause if (1) the declarant is unavailable to testify at trial and (2) the accused has had no prior opportunity to cross-examine the witness. Similarly, the South Carolina Supreme Court has recognized the Sixth Amendment is not implicated by non-testimonial hearsay. However, the fact that the Sixth Amendment is not implicated by non-testimonial hearsay does not mandate the evidence be admitted.

*State v. Garner*, 389 S.C. 61, 66, 697 S.E.2d 615, 617–18 (Ct.App.2010) (citations omitted).

A 911 call, . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance. The difference between the interrogation in *Davis* and the one in *Crawford* [9] is apparent on the face of things. In *Davis*, McCottry was speaking about events *as they were actually happening*, rather than "describ[ing] past events[.]" Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had

---

9. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered in *Davis,* again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

We conclude from all this that the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness;* she was not *testifying.*

*Davis v. Washington,* 547 U.S. 813, 827–28, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (second, third, and fifth alteration by court) (citations omitted).

 We find Randy's call was not testimonial. At the beginning of the call, Randy stated he was calling because his wife tried to kill him. He gave his name and address and stated he would kill his wife if she came inside his trailer, where he was at the time. The 911 operator asked what his wife did to him. Randy answered that she hit him with a club and tried to kill him and he was now bleeding from the head. Randy indicated he was inside his trailer and did not know where Brenda was because she ran away after she hit him. He stated he had to break the window to get into his trailer because he had dropped his keys. The operator asked him what kind of club Brenda used and if they were fighting. He provided it was a wood club used by truck drivers and they were not fighting. He stated he and Brenda were leaving to

go to the credit union at his work when she struck him. He also stated he did not know what was going on. The 911 operator asked if he hit Brenda with a hoe and he answered no, explaining Brenda attacked him with the club.

About four and a half minutes into the call, the 911 operator informed Randy Brenda was no longer outside the trailer because she was at the police station. Randy expressed uncertainty, asked for help again, and said he was bleeding. He insisted he did not know where Brenda was when the operator asked him to put his gun in the closet. The operator asked Randy where he and Brenda were going and he answered they were going to the credit union at his work. The operator asked him what kind of car Brenda drove and he answered a black Isuzu Rodeo. After some silence and no question by the operator, Randy stated Brenda just started hitting him and was trying to kill him, he ran, and he had to break the door to get into his trailer because he dropped his keys. The 911 operator told him to step onto the porch. Randy told the operator he was going to go back inside to put his shoes on and then shortly thereafter help arrived and the call ended. Randy breathed heavily and sounded distressed throughout the call.

The trial court did not abuse its discretion in allowing the statement. At the beginning of the call, the operator questions Randy to determine if there was an ongoing emergency. The recording in this case falls in between those in *Crawford* and *Davis* but is closer to *Davis*, in which the evidence was non-testimonial. Although some of what Randy says is describing events that happened, those events had just happened, not several hours prior as in *Crawford*. Randy seems to be in a state of ongoing emergency, worrying his wife is going to enter the trailer at any moment to attack him again, unlike in *Crawford* in which the statements were made to officers in a police station. Like in *Davis*, Randy too is frantic. Although several minutes into the call, Randy learns Brenda is at the police station, he is still afraid she will come into the trailer at any moment. Randy's belief Brenda might still enter to trailer to hurt him despite the 911 operator's reassurance she is not on the property underscores that Randy is not calm and rational and is still operating as though the attack is still in progress. Further, Randy's statements after the operator assured him Brenda was at the police

station and would not be coming back are the same statements he made earlier in the call before he was told Brenda was not outside the trailer. *See State v. Wyatt,* 317 S.C. 370, 373, 453 S.E.2d 890, 891 (1995) (holding error in admission of evidence is harmless when it was merely cumulative to other evidence in the record).

Additionally, the trial court did not abuse its discretion in ruling the unfair prejudice did not outweigh the probative value. Although Randy sounded scared and said his wife tried to kill him, that was his continuing perception of the ongoing emergency. The State presented testimony at trial Randy was terrified of Brenda after the accident and the recording assisted in demonstrating why he feared for his life. The State also presented testimony about the extent of Randy's injuries and how he got those injuries. Accordingly, the tape was not more unfairly prejudicial than probative. Therefore, the trial court did not abuse its discretion in admitting the tape.

## CONCLUSION

We find the trial court did not err in denying Brenda's motion for a directed verdict or her motion to exclude the recording of the 911 call. Accordingly, the trial court is

**AFFIRMED.**

THOMAS and GEATHERS, JJ., concur.