**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Bradford Hester Williams, Appellant.

Appellate Case No. 2017-001753

———————

Appeal From Greenville County
Alexander S. Macaulay, Circuit Court Judge

———————

Unpublished Opinion No. 2022-UP-150
Heard April 6, 2021 – Filed March 23, 2022

———————

**AFFIRMED**

———————

Kathrine Haggard Hudgins, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General Melody Jane Brown, William Joseph Maye, all of Columbia, for Respondent.

———————

**PER CURIAM:** Counsel for Bradford Hester Williams (Appellant) filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting that there were no meritorious grounds for appeal and requesting permission to withdraw from further representation. This court denied the request to withdraw and directed the parties to file additional briefs. We affirm.

The night before Thanksgiving in 2014, Quante Davis, Sylvester Fuller, and Jamal Justice went to a night club, the Bugatti Grand, in Greenville. According to Davis, Appellant also showed up at the club. Upon seeing Appellant, Davis asked Fuller and Justice to follow him outside. There, Davis explained that he had a dispute with Appellant. At trial, Davis testified that Appellant was upset with him because of a dispute over a gun. According to Davis, Appellant was "riding around looking for me, basically, saying threats."

During the discussion, Davis "got into a phone conversation" and walked around the building, while Fuller and Justice went back inside the club. Davis heard shots a few moments later.

Two bar employees testified to seeing either three or four men engaged in a conservation shortly before the shots were fired. One of the employees, Bobby Eddie Snoddy, said one of the men was inside a Cadillac. Snoddy later described the car as being "tan" or "beige." Snoddy identified the man inside the car as either about 40 years old or "between 40 or 50 years old."[1] After the shots, Snoddy recalled seeing the Cadillac pulling out of the parking lot. He later described the car as being "in a hurry. It was in a rush to get away."

When Davis walked around the building to the front of the club, he saw Fuller and Justice lying on the ground. Davis also testified to seeing Appellant backing out of the club's parking lot in a "gray 2005 Cadillac."[2] Investigator Michael Fortner testified that no witness other than Davis could definitely place Appellant at the club that night.

Fuller was pronounced dead at the scene. Justice would later die at the hospital.

Davis left the scene to avoid police and later had a panic attack.[3] An ambulance was called to his location, and police also showed up and took Davis into custody.

---

[1] Appellant was twenty-five years old at the time of the trial. Counsel stated that Appellant was twenty-two when the murders took place.

[2] Davis was already familiar with Appellant's car because he was present when Appellant purchased it. Another witness, Jessie Barksdale, also recalled seeing a silver Cadillac "backing out" of the club's parking lot after the shots were fired.

[3] Davis was afraid of being arrested for a probation violation.

Police investigating the crime found shell casings from a .380 firearm, along with a nine-millimeter casing and at least three .40-caliber casings. Another shell casing believed to be connected to the shootings was found wedged in a car that was stopped on a traffic violation.

Elsewhere, Mitchell Sloan was preparing for Thanksgiving dinner. In a December 8, 2014 interview with Investigator Fortner and Investigator Chris Hammett—played for the jury in Appellant's trial—Sloan described a call he received from Appellant and the aftermath.[4] In the call, Appellant urgently asked Sloan to speak to Sloan's brother. In a subsequent phone call, Appellant also told Sloan that "some s*** just went down."

Sloan later fielded a call from another individual who indicated that (1) there had been a shooting at the club; (2) Sloan should "check on" Appellant; and (3) someone "said [Appellant] and two other dudes went out there right before that s*** happened." Sloan said that Appellant visited Sloan's home the following evening. The two men "sat in the yard, [and] we smoked a blunt," and Appellant began relating the events of the previous evening.

According to Sloan, Appellant was "looking for" an individual—presumably Davis—because Davis had allegedly stolen drugs from Appellant. Sloan also mentioned that the individual Appellant was seeking had "some kind of attack thing." Sloan said Appellant saw that "two dudes from across the bar was looking at him all crazy," and Appellant got "a feeling, so he left." Appellant then recounted a confrontation with the men in the parking lot, after which one of the men "told some girl to go get [their] gun." Sloan later said: "[W]hen he heard them say that, he said he shot bam bam three times, duh duh three times, and then he rolled out. He was driving a gray Cadillac then[.]" Sloan stated that Appellant said the gun used in the shooting was a .380. At the time, according to Investigator Fortner, authorities had not publicly identified the weapon used to kill the two men as a .380 or the number of shots police believed to have been fired.[5]

On December 11, 2014, police arrested Appellant at a hotel where he was staying. Investigator Fortner testified that Appellant and his then-girlfriend, Tiara Washington, had previously vacated a different hotel where they were living on

---

[4] The State did not provide a transcript of the interview at trial or in this appeal. The recording was played at length for the jury. Appellant does not challenge the use of the unedited recording at trial.

[5] Investigators believe that six shots were fired, though only five hit the victims.

Thanksgiving Day, despite having paid for the room through December 1. Appellant was later indicted for the murders of Justice and Fuller and for possessing a deadly weapon during the murders. Neither the gun nor the Cadillac were produced at trial.

At trial, Davis testified that he had never seen Appellant with a .380 firearm. On cross-examination, Davis conceded that he did not see Appellant shoot the victims and that he had stated in a previous interview that he did not see Appellant with a weapon. Davis also denied having a gun at the club.[6]

Sloan recanted his entire statement to police during his testimony, saying that he could not remember what he said during the interview and that he had made up the story under pressure from officers, using information he got on the street. Sloan told the court: "When I did speak to them, I was under, like, a lot of pressure. And most of it was false because I was scared. And, like, I really apologize about everything. But I'm really just trying to make everything right." On cross-examination, Sloan agreed with the suggestion by counsel for Appellant that Sloan, who had been jailed on a bench warrant, was trying to get released before Christmas when he made the recorded statement. Investigator Fortner denied pressuring Sloan.

After the State rested, Appellant moved for a directed verdict. The trial court denied the motion.

Washington and Appellant testified for the defense, offering various explanations for their actions surrounding the time of the shooting. On cross-examination, Appellant conceded that after he was released from custody on bond, he cut his anklet and went to Georgia. On redirect, he testified that he was afraid his bond was going to be revoked because he "failed a drug test," and he wanted to avoid returning to jail. Appellant also claimed that he had intended to turn himself in.

William Ellison, the club's owner, also testified for the defense, stating that on the early morning of the shooting, a man he knew as "Forty" was "beating at the door" and "waving a gun saying that someone just shot his friends." Ellison said Forty's "real name" was "Quante." Ellison also said he had "never ever seen [Appellant] ever in my life."

After the presentation of all the evidence, Appellant renewed his motion for a directed verdict. The circuit court again denied the motion.

---

[6] Davis's girlfriend later told law enforcement that he had allegedly dropped a BB gun during the medical incident after the shooting.

During deliberations, the jury asked the court to again play the audiotape of Sloan's initial interview with investigators and the videotape of a conversation between Washington and Investigator Fortner. The circuit court played both. After approximately five-and-a-half hours of deliberation over two days, the jury convicted Appellant of both murders.

After careful consideration of the record and briefs, the judgment of the lower court is affirmed pursuant to Rule 220(b), SCACR, and the following authorities: *State v. Bennett*, 415 S.C. 232, 236–37, 781 S.E.2d 352, 354 (2016) ("[W]hen ruling on a directed verdict motion, the trial court views the evidence in the light most favorable to the State and must submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'" (quoting *State v. Littlejohn*, 228 S.C. 324, 329, 89 S.E.2d 924, 926 (1955))); *id.* at 237, 781 S.E.2d at 354 ("Therefore, although the *jury* must consider alternative hypotheses, the *court* must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt."); *State v. Larmand*, 415 S.C. 23, 32, 780 S.E.2d 892, 896 (2015) ("Although Respondent presented plausible explanations for each of these facts, our duty is not to weigh the plausibility of the parties' competing explanations. Rather, we must assess whether, in the light most favorable to the State, there was substantial circumstantial evidence from which the jury could infer Respondent's guilt."); *Littlejohn*, 228 S.C. at 329, 89 S.E.2d at 926 ("[O]n a motion for direction of verdict, the trial judge is concerned with the existence or non-existence of evidence, not with its weight; and, although he should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty, it is his *duty* to submit the case to the jury if there be any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced." (emphasis added)); *State v. Bratschi*, 413 S.C. 97, 107, 775 S.E.2d 39, 44 (Ct. App. 2015) ("A case should be submitted to the jury when the evidence is circumstantial if there is any substantial evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced." (quoting *State v. Bostick*, 392 S.C. 134, 139, 708 S.E.2d 774, 776 (2011));[7] *see also Bennett*, 415 S.C. at 237, 781 S.E.2d at 354 ("Accordingly, in ruling on a directed verdict motion where the State relies on circumstantial evidence, the court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt."); *State v.*

---

[7] *Bratschi* notes that it omitted certain internal quote marks in its quotation of *Bostick*.

*Wright*, 269 S.C. 414, 417, 237 S.E.2d 764, 766 (1977) ("It is axiomatic that the credibility of the testimony of these witnesses is for the jury. The duty of determining which statement of the witnesses was the truthful one was *a matter exclusively for the jury*, which issue has been resolved against the interests of [the defendant]." (emphasis added)).

In this case, whether Appellant was guilty beyond a reasonable doubt quickly becomes a question of whether one believes either Sloan's account when he spoke to officers shortly after the shooting or his testimony in court. Our courts have held that this is axiomatically "a matter exclusively for the jury." *Id.*

Additionally, we note the striking degree to which Sloan's initial statement matches up with the other evidence in the case. Officers testified that a .380 was used in the shooting, a fact that was not disclosed to the public at the time of Sloan's statement; yet Sloan told officers in his initial interview that Appellant relayed to him that a .380 was used in the shooting. Other telling details—such as the panic attack suffered by Davis—would have been difficult for Sloan to make up. Even after hearing the recording of Sloan's statement, Appellant testified that his dispute with Davis was over a drug theft, not over the fate of a weapon as Davis stated. Appellant's alleged confession to Sloan could also illustrate his state of mind at around the same time that he was vacating his residence.

During oral arguments before this court, Appellant seemed to impart great significance to whether Sloan's earlier statement was direct evidence or circumstantial.

> Direct evidence "is based on personal knowledge or observation and . . . , *if true,* proves a fact without inference or presumption." *Black's Law Dictionary* 636 (9th ed. 2009) (emphasis added). The presentation of direct evidence "immediately establishes the main fact to be proved." *State v. Salisbury*, 343 S.C. 520, 524 n.1, 541 S.E.2d 247, 249 n.1 (2001). Circumstantial evidence, on the other hand, is proof of a chain of facts and circumstances from which the existence of a separate fact may be inferred. *State v. Cherry*, 361 S.C. 588, 596, 606 S.E.2d 475, 479 (2004). Circumstantial evidence is "based on inference and not on personal knowledge or observation," *Black's Law Dictionary* 636 (9th ed. 2009), and establishes "collateral facts from which the main fact

may be inferred." *Salisbury*, 343 S.C. at 524 n.1, 541 S.E.2d at 249 n.1.

*State v. Rogers*, 405 S.C. 554, 563, 748 S.E.2d 265, 270 (Ct. App. 2013).  Appellant suggested that Sloan's earlier statement was no longer direct evidence after Sloan recanted, meaning that the State had to present substantial circumstantial evidence of Appellant's guilt.

Even if we were to accept that Appellant's interpretation is correct, Sloan's statement is still evidence—circumstantial evidence that must be considered in determining whether the State presented substantial circumstantial evidence. Without the evidence of Sloan's statement—direct or circumstantial—we would be more inclined to agree with Appellant.  Aside from Sloan's initial interview with police, the State's evidence consisted largely of (1) the testimony of just one witness, whom Appellant identified at trial as a potential suspect in the murder, that Appellant was even at the scene of the crime; (2) inconsistent statements about the presence of a vehicle that might have matched the description of a vehicle Appellant was known to drive; (3) the potentially suspicious decision by Appellant to vacate his living quarters on Thanksgiving Day; and (4) his decision to flee to Georgia.  But Sloan's previous statement was made, and with it, the State's case became strong enough to overcome a motion for directed verdict.

**AFFIRMED.**

**KONDUROS, GEATHERS, and MCDONALD, JJ., concur.**