# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Victor McCoy Weldon, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2017-002000

―――――――――

## ON WRIT OF CERTIORARI

―――――――――

Appeal From Clarendon County
Jocelyn Newman, Circuit Court Judge

―――――――――

Opinion No. 5867
Heard March 1, 2021 – Filed October 6, 2021

―――――――――

## REVERSED AND REMANDED

―――――――――

Appellate Defender Taylor Davis Gilliam, of Columbia,
for Petitioner.

Attorney General Alan McCroy Wilson, Senior Assistant
Deputy Attorney General Megan Harrigan Jameson, and
Assistant Attorney General Brianna Lynn Schill, all of
Columbia, for Respondent.

―――――――――

**MCDONALD, J.:** Victor M. Weldon (Petitioner) argues the post-conviction relief
(PCR) court erred in finding he received effective assistance of counsel despite
trial counsel's failure to call Petitioner or either of his alibi witnesses to testify at

Petitioner's trial.  As to the alibi witnesses, we agree; thus, we reverse and remand to the court of general sessions for a new trial.

**Facts and Procedural History**

Following a May 2012 trial, a jury found Petitioner guilty of first-degree burglary, armed robbery, grand larceny, kidnapping, and possession of a weapon during the commission of a violent crime in connection with the robbery of Edward Gibbons (Victim) on May 15, 2010.  The trial court sentenced Petitioner to consecutive thirty-year sentences for first-degree burglary and armed robbery, and concurrent five, twenty, and five-year sentences for grand larceny, kidnapping, and the weapons charge.  Petitioner appealed his conviction, and this court affirmed, finding the trial court did not err in denying Petitioner's directed verdict motion. *See State v. Weldon*, Op. No. 2014-UP-463 (S.C. Ct. App. filed Dec. 17, 2014). Thereafter, Petitioner filed an application for PCR, which the PCR court denied by order dated July 28, 2017.  Following our supreme court's transfer of the matter, the court of appeals granted the petition for a writ of certiorari and ordered briefing.

At trial, Victim testified he was preparing to leave his home between 6:00 and 6:30 a.m. on May 15, 2010, when three masked men emerged from a storage room in his garage and jumped him.  The men threw Victim to the ground, and one assailant sat across Victim's chest and hit him in the face while another sat on his legs.  The three men restrained Victim by wrapping duct tape around his head; they then took his personal property, including money, and left together in his vehicle. An acquaintance of Victim found the stolen vehicle abandoned on the side of the road at approximately 6:40 a.m.

Days after the robbery, Investigator Kenneth Clark of the Clarendon County Sheriff's Department received reports of three individuals spending a lot of money. In connection with these reports, Investigator Clark interviewed Michael Pearson. Shortly thereafter, Investigator Clark learned Pearson's fingerprint positively matched a fingerprint taken from Victim's stolen vehicle.  A subsequent "positive [DNA hit] came off the black duct tape that was wrapped around Victim's head," and the DNA matched Petitioner.  Investigator Clark testified Petitioner was not a person of interest in the case until law enforcement received the DNA hit.  Four pieces of duct tape were collected from the crime scene, but Petitioner's DNA was found on only one piece recovered from Victim's head.  Investigator Clark admitted that none of the people he interviewed implicated Petitioner in the robbery.

Although Petitioner denied knowing Pearson, Investigator Clark discovered Petitioner and Pearson had both attended the South Carolina Vocational Rehabilitation Center (Vocational Rehabilitation) for a four-day period in December 2008; their time cards indicated both men worked in the wood shop on three of those days. A Vocational Rehabilitation area supervisor, John Hornsby, testified that approximately twenty-five people worked in the 250-square-foot wood shop on a daily basis. He confirmed everyone working in the wood shop worked six hours a day on the same shift, ate in the same area, and shared a restroom.

Catherine Leisy, a forensic scientist at the South Carolina Law Enforcement Division (SLED), testified she tested a swab from duct tape taken from Victim's head, and this swab contained a mixture of DNA from at least two individuals. Petitioner was the major DNA contributor on the swab taken from this part of the duct tape. She explained, "The probability of randomly selecting an unrelated individual having a profile matching the major contributor to this mixture is approximately 1 in 670 billion." Petitioner's DNA did not match the DNA on any of the other items she received for testing, including the swabs from other pieces of duct tape recovered from Victim. When asked on cross-examination whether she had "any information as to whether the pertinent sample came from the inside or the outside of the duct tape," Leisy responded, "The description that I received was a swab from outside and inside area [sic] of the black duct tape from the victim's head." Trial counsel then asked, "So the swab was taken on both sides of the duct tape?" Leisy answered, "Based on the information I received, yes sir." Leisy did not receive the duct tape itself, only the swabs taken from the tape.

The trial court advised Petitioner of his Fifth Amendment right not to testify, and Petitioner confirmed he had been afforded sufficient time to discuss his decision with trial counsel. The trial court then stated,

> And only you can talk to your lawyers, you can get advice from your lawyers as to what they think you should or should not do or whatever trial strategy they plan to implement. But ultimately it is your decision and not theirs as to whether you testify or not.

Petitioner indicated he understood and chose not to testify.

In its closing argument, the State argued,

> You don't think the DNA is enough?  What about that
> story?  Mr. Weldon?  I don't know anything about this
> case.  His DNA is on the tape.  Not the tape on the floor.
> Not the tape that somebody found in the storage room.
> His DNA is on the tape that [was] wrapped around
> [Victim's] head . . . .

In his closing, trial counsel emphasized that the only evidentiary item implicating Petitioner was one swab from the duct tape.  He argued,

> My first point is you will notice on that report that they
> took a swab from the outside of the duct tape and the
> inside of the duct tape, but they didn't test them
> separately.  They jumbled them up and tested them
> together.
>
> Certainly if they were able to show that Victor Weldon's
> DNA was on the dead center middle sticky side of the
> duct tape five feet into the roll, we'd have a much more
> difficult case today.  That evidence is not there.  There is
> evidence that there may be his DNA on the duct tape;
> possibly from the outside and possibly from the inside.

Trial counsel also noted duct tape is not "some Samurai sword or a hunting knife" or otherwise unusual item.  He stated, "I've got duct tape in my truck, in my boat, in my kitchen drawer, in my tool box; I don't know if that duct tape in my boat is my duct tape or if it's my buddy's duct tape from the last time we went fishing." Both Petitioner and Pearson were convicted.[1]

---

[1] Petitioner and Pearson were tried together.  After the State rested in the joint trial, each moved for a directed verdict:

> Pearson argued that even though his fingerprint was
> found on the outside of Gibbons'[s] car, the fingerprint
> was insufficient to place him at the crime scene.  In reply,
> the State argued the fingerprint was found on the rear of
> the vehicle, where Gibbons testified one of the men who
> robbed him had been seated as they fled his house.

At the PCR hearing, Petitioner claimed he wanted to testify at trial but did not because "[trial counsel] said he wanted the closing argument." Petitioner testified he told trial counsel he was at his house with his mother on the morning of the armed robbery. At that time, Petitioner lived with his mother and his sister; Petitioner's girlfriend and his little brother stayed with them occasionally. Petitioner testified that between 6:00 and 6:30 a.m., when the crimes occurred, he and his girlfriend were "just getting up with my sister, waiting for my mother to come home." His mother normally came home from work between 7:00 and 7:15 a.m. Petitioner believed that on the night of May 14, he would have been home and he had probably gone to bed around 11:00 p.m. He testified his sister was home when he went to bed that night and he believed he woke up the morning of the 15th around 6:40 or 6:45 a.m. Petitioner saw his sister when he woke up, and he saw his mother when she arrived home between 7:00 and 7:15 a.m. Petitioner claimed he told all of this to trial counsel, and he believed his mother and sister could have testified they were with Petitioner at their home when the armed robbery occurred. He explained his mother and sister were present at the trial and he was concerned when they did not testify. Although he did not understand this, he did not ask trial counsel about it at trial because he was nervous.

Petitioner's mother, Deborah Weldon (Mother), testified she was present at Petitioner's trial, and although trial counsel had asked her to testify, he never called her as an alibi witness. Petitioner lived with her at her Sumter home on May 15,

---

*State v. Pearson*, 410 S.C. 392, 397, 764 S.E.2d 706, 709 (Ct. App. 2014), *rev'd*, 415 S.C. 463, 783 S.E.2d 802 (2016). This court reversed Pearson's conviction, finding the single recovered fingerprint

> merely raised a suspicion of Pearson's guilt because there was no additional evidence showing when the fingerprint was placed on the vehicle. Moreover, none of the other evidence presented by the State placed Pearson at the crime scene or established a relationship between Pearson and Weldon. For this reason, the jury could only have guessed Pearson was involved in the crimes.

*Id*. at 402, 764 S.E.2d at 712. Our supreme court reversed this court and affirmed Pearson's convictions, finding sufficient substantial circumstantial evidence of Pearson's guilt existed to withstand the directed verdict motion. *State v. Pearson*, 415 S.C. 463, 474, 783 S.E.2d 802, 808 (2016).

2010, and Mother saw Petitioner on the night of May 15 when he woke her up around midnight to tell her to move from the couch to her bed. Mother testified Petitioner was home when she woke up at 8:00 a.m. on May 15. To Mother's knowledge, Petitioner did not leave the house during the evening of May 14 or the morning of May 15. Mother did not work overnight on May 15, 2010, because at that time, she was working on an "as needed" schedule at Tuomey Hospital.

Petitioner's sister, Jessica Weldon (Sister), testified she was present at Petitioner's trial and trial counsel told her she would testify, but he never called her to the stand. Sister recalled when she went to bed around midnight on May 14, Petitioner was at home in his room with his girlfriend. Petitioner's room was "very close" to hers and "[she could] see everything coming out his room, [and] going in." Sister testified she woke up around 5:00 a.m. the next morning when a friend called, and she saw Petitioner asleep in his bed when she went into Petitioner's room "to sneak a cigarette from his girlfriend at the time." While Sister was outside smoking, she saw Petitioner "peek out the window." Sister testified she was at home between 6:00 and 7:00 a.m., and Petitioner was in his room with his girlfriend. The next time she saw Petitioner leave his room was around 9:00 a.m. that morning, when Petitioner let his two cats outside to play.

Trial counsel explained his trial strategy was to attack the DNA evidence, and he believed the weakness of the DNA evidence was that it could not be determined whether the DNA sample had been taken from the outside or the inside sticky side of the duct tape. If the DNA was found on the sticky side, trial counsel believed it was much more likely that Petitioner was present during the crime. Trial counsel confirmed he spoke with Mother and Sister about Petitioner's whereabouts on May 15, and the substance of those conversations would have been very similar to their testimonies at the PCR hearing. Trial counsel had filed a notice of an alibi defense but confirmed he did not call any witnesses at trial on Petitioner's behalf. He did not know why he failed to call the witnesses, but he admitted there was a notation in his trial notebook indicating he had prepared to question Mother regarding Petitioner's alibi. Trial counsel conceded that in hindsight, he should have called Mother and Sister as witnesses, and he thought presenting their testimony could have changed the outcome of Petitioner's trial. Trial counsel testified he may have considered having the last argument versus presenting witnesses, but he was not sure whether that was the reason he failed to call them. Trial counsel explained,

> With, with hindsight, you know, reading the PCR
> application, I'm scratching my head wondering why we
> would not have called our alibi witnesses, and that's the

only thing I can come up with, but I don't see that in my notes that were taken at the time of trial.

Trial counsel agreed with PCR counsel's statement that even if he had made an actual decision on this point in order to retain the final closing argument, "calling alibi witnesses would have been a much more favorable strategic decision versus not calling alibi witnesses and trying to get the last argument."

On cross-examination, the State asked trial counsel whether he was concerned with whether the witnesses' stories at the PCR hearing "didn't quite match up." Although trial counsel did not recall the alibi witnesses' stories "not matching up," he responded that Petitioner's case would have been better if he had called only one alibi witness. However, trial counsel reiterated, "With hindsight, I have no idea why I did not call the alibi witnesses." In response to various scenarios presented by the State, trial counsel agreed it was possible the State could have called witnesses to rebut the alibi testimony. Trial counsel recalled speaking with Petitioner's girlfriend prior to trial, and although he did not remember the details of their conversation, he did "recall in general the people in the household being part of an alibi." Trial counsel acknowledged that if he had presented the alibi witnesses, he would not have had the final argument. When asked whether he had ever participated in a joint trial such as this one, trial counsel responded, "I'm a real estate attorney, so I don't do criminal trials. I, I—well, in twenty-something years, I may have done one or two but generally I don't . . . try criminal cases." There was no redirect.

In its order of dismissal, the PCR court held trial counsel was not ineffective for failing to call the alibi witnesses. Specifically, the court found,

> Trial counsel testified that having conflicting alibi witnesses would have hurt his case rather than help, and it is reasonable to think that he considered this as part of his strategy in not calling these witnesses.
>
> The decision not to use contradictory alibi witnesses at trial was very likely part of Trial Counsel's strategy. . . .
>
> . . . .
>
> . . . . Even though Trial Counsel did not recall his specific reasoning for choosing not to call alibi witnesses,

his trial strategy can be inferred from the basis of his overall strategy, which he testified was to attack the State's DNA evidence against [Petitioner].

The PCR court further found the testimony at the PCR hearing reflected trial counsel's intention to have the final closing argument, stating:

> Trial Counsel's decisions at the trial were clearly made with a tactical strategy in mind and his actions were carefully chosen, even if he disagreed with them looking back in hindsight. Trial Counsel was at least reasonably competent in his decisions at the time of trial, and thus his representation was not ineffective.

> Because Trial Counsel articulated, both at the PCR hearing and at the time of trial, a strategic reasoning for choosing not to call alibi witnesses, his performance cannot be found ineffective, and this allegation is denied and dismissed with prejudice.

The PCR court deemed meritless Petitioner's argument that trial counsel was ineffective in failing to call Petitioner to testify. The PCR court found Petitioner did not present any evidence that proved trial counsel would not allow him to testify, and trial counsel could not recall why Petitioner chose not to take the stand. The court further found that if trial counsel had advised Petitioner not to testify, it would have fit into trial counsel's trial strategy to have the final closing argument by not putting up a defense; the PCR court held this was "a reasonable strategy that should not be questioned in hindsight."

Additionally, the PCR court found Petitioner failed to meet his burden of showing he was prejudiced by any alleged deficiencies because there was "overwhelming evidence of his guilt." The court specifically noted Petitioner's DNA was found on the duct tape recovered from the victim, and although this was "essentially" the only direct evidence linking Petitioner to the crime, an exact DNA match could not be easily rebutted. Thus, the court determined it was "unlikely that any other actions by Trial Counsel could have prevented a jury from convicting [Petitioner] based on this DNA evidence."

**Standard of Review**

"Our standard of review in PCR cases depends on the specific issue before us. We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018). "We review questions of law de novo, with no deference to trial courts." *Id.* at 180–81, 810 S.E.2d at 839.

**Law and Analysis**

"In post-conviction proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). "We defer to a PCR court's findings of fact and will uphold them if there is any evidence in the record to support them." *Mangal v. State*, 421 S.C. 85, 91, 805 S.E.2d 568, 571 (2017). "This court gives great deference to the PCR court's findings on matters of credibility." *Putnam v. State*, 417 S.C. 252, 260, 789 S.E.2d 594, 598 (Ct. App. 2016).

"A criminal defendant is guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution." *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013). "In order to establish a claim for ineffective assistance of counsel, the applicant must show that: (1) counsel failed to render reasonably effective assistance under prevailing professional norms, and (2) counsel's deficient performance prejudiced the applicant's case." *Speaks*, 377 S.C. at 399, 660 S.E.2d at 514. Deficiency "is measured by an objective standard of reasonableness." *Taylor*, 404 S.C. at 359, 745 S.E.2d at 102. To establish prejudice, an applicant must show that "but for counsel's error, there is a reasonable probability the result of the proceedings would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "In other words, he must show that 'the factfinder would have had a reasonable doubt respecting guilt.'" *Edwards v. State*, 392 S.C. 449, 459, 710 S.E.2d 60, 66 (2011) (quoting *Strickland*, 466 U.S. at 695). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

"Counsel's performance is accorded a favorable presumption, and a reviewing court proceeds from the rebuttable presumption that counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Smith v. State*, 386 S.C. 562, 567, 689 S.E.2d 629, 632 (2010) (quoting *Strickland*, 466 U.S. at 690). "Accordingly, when counsel articulates a valid reason for employing a certain strategy, such conduct will not be

deemed ineffective assistance of counsel." *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[W]here trial counsel admits the testimony of a certain witness may have made the difference in obtaining an acquittal, the Court may find ineffective assistance." *Pauling v. State*, 331 S.C. 606, 610, 503 S.E.2d 468, 471 (1998).

"In rare cases, using 'overwhelming evidence' as a categorical bar to preclude a finding of prejudice is not error." *Smalls*, 422 S.C. at 190, 810 S.E.2d at 844.

> [F]or the evidence to be "overwhelming" such that it categorically precludes a finding of prejudice . . . the evidence must include something conclusive, such as a confession, DNA evidence demonstrating guilt, or a combination of physical and corroborating evidence so strong that the *Strickland* standard of "a reasonable probability . . . the factfinder would have had a reasonable doubt" cannot possibly be met.

*Id*. at 191, 810 S.E.2d at 845 (quoting *Strickland*, 466 U.S. at 695). "Additionally, the strength of the State's evidence should be viewed in light of trial counsel's errors such that there 'is no reasonable possibility [counsel's errors] contributed in any way to [the applicant's] convictions.'" *Martin v. State*, 427 S.C. 450, 456, 832 S.E.2d 277, 280 (2019) (alterations in original) (quoting *Smalls*, 422 S.C. at 191, 810 S.E.2d at 845).

Initially, we find Petitioner has failed to show trial counsel was ineffective in failing to call Petitioner to testify at trial. *See Speaks*, 377 S.C. at 399, 660 S.E.2d at 514 ("In post-conviction proceedings, the burden of proof is on the applicant to prove the allegations in his application."). At the PCR hearing, Petitioner claimed he wanted to testify but did not because trial counsel told him he wanted the final closing argument. Petitioner did not testify that trial counsel prevented him from testifying at trial, and he did not elicit testimony from trial counsel at the PCR hearing addressing this issue. The trial court advised Petitioner of his Fifth Amendment right and emphasized it was his decision, not trial counsel's, whether or not to testify. Accordingly, we find evidence supports the PCR court's denial of post-conviction relief on this ground.

However, we find no evidence supports the PCR court's findings that trial counsel provided effective assistance or implemented—much less articulated—any valid trial strategy with respect to the alibi witnesses. *See Martin*, 427 S.C. at 456, 832 S.E.2d at 280) (finding "as a matter of law that Petitioner's trial attorneys were deficient for not eliciting the specific alibi timeline testimony from Petitioner's mother" where "[l]ead counsel candidly admitted his file contained the mother's statement" as to the time she took Petitioner to the bus stop in Atlanta and the drop-off time coincided with that of the armed robbery). Mother's and Sister's timeline testimonies are comparable to that in *Martin*, and the PCR court's finding that trial counsel's "decision not to use contradictory alibi witnesses at trial was very likely part of [his] trial strategy" is unsupported by the record.

Trial counsel admitted at the PCR hearing that he did not know why he failed to elicit Petitioner's alibi from at least one of the available alibi witnesses. Although trial counsel hypothesized he did not call the witnesses so that Petitioner could have final argument, he agreed "that calling alibi witnesses would have been a much more favorable strategic decision versus not calling alibi witnesses and trying to get the last argument." On cross-examination, trial counsel reiterated he did not know why he did not call the witnesses. But he thought that if it had been an issue, he "would have had a discussion with [himself] and made a conscious choice" not to present their testimony.

We recognize trial counsel agreed with the State's suggestion that he may have declined to call the witnesses because the State might have then called rebuttal witnesses to challenge the alibi testimony and because he wanted to have the last closing argument. Still, trial counsel repeatedly testified he did not know why he chose not to call the witnesses. Thus, we can find no support in the record for the PCR court's finding that because trial counsel "articulated, both at the PCR hearing and at the time of trial, a strategic reason for choosing not to call alibi witnesses, his performance cannot be found ineffective."

And while there are minor discrepancies among the witnesses' testimonies regarding exactly what time Petitioner woke up on May 15 and whether Mother worked the night of May 14, these discrepancies did not involve credibility issues nor were they necessarily contradictory. *Cf. Edwards*, 392 S.C. at 458, 710 S.E.2d at 65 ("A witness's credibility and demeanor is crucial to an attorney's trial strategy, and an attorney cannot be said to be deficient if there is evidence to support his decision to not call a witness with *serious* credibility questions, even if that witness is a co-defendant." (emphasis added)). Sister's testimony could have provided Petitioner with an alibi because she testified she saw him at their Sumter

home around 5:00 a.m., he was at the house between 6:00 a.m. and 7:00 a.m., and she did not see him leave his room until 9:00 a.m. when he let his cats outside. *See Walker v. State*, 407 S.C. 400, 406–07, 756 S.E.2d 144, 147 (2014) (finding a witness's testimony that she spent every weekend with the petitioner provided sufficient testimony to support the PCR court's conclusion that the witness would have offered alibi testimony "that reasonably could have resulted in a different outcome at trial" because, if true, the testimony showed it was impossible for petitioner to have committed the crime that occurred on a Saturday). Thus, we can conceive of no *valid* trial strategy supporting trial counsel's failure to call at least one of the alibi witnesses.[2]

Further, we find the presence of Petitioner's DNA on a single piece of duct tape recovered from Victim does not constitute "overwhelming evidence" such that it precludes a finding of prejudice. *See Smalls*, 422 S.C. at 190, 810 S.E.2d at 844 ("In rare cases, using 'overwhelming evidence' as a categorical bar to preclude a finding of prejudice is not error."). Other than his possible acquaintance with Pearson, the DNA match from the duct tape was the only evidence presented at trial linking Petitioner to the crime, and there could be other reasonable explanations for its presence. Petitioner was not a person of interest in the investigation until the DNA hit. Petitioner challenged the strength of the DNA evidence, and the testimony he elicited from Leisy may have been sufficient to raise a reasonable doubt regarding his guilt had he also presented evidence of an alibi. *See id*. at 191, 810 S.E.2d at 845 ("[F]or the evidence to be 'overwhelming' such that it categorically precludes a finding of prejudice . . . the evidence must include something conclusive, such as a confession, DNA evidence demonstrating guilt, or a combination of physical and corroborating evidence so strong that the

---

[2] Of additional concern is the PCR court's finding that "[t]rial counsel's decisions were *clearly made* with a tactical strategy in mind and his actions were *carefully chosen*, even if he disagreed with them looking back in hindsight." (Emphasis added). In discussing prejudice and overwhelming evidence, the PCR court further noted trial counsel "testified that his trial strategy was to attack the State's DNA evidence against Applicant, which he did fully," yet the court also found "Applicant did not dispute the evidence against him. This is clearly overwhelming evidence of Applicant's guilt." Finally, it appears the court conflated the fingerprint evidence against Pearson with Petitioner's DNA match from the duct tape, as the order denying relief states "Applicant's fingerprints were found on the duct tape that was placed on the victim by his attackers during the robbery."

*Strickland* standard of 'a reasonable probability . . . the factfinder would have had a reasonable doubt' cannot possibly be met." (quoting *Strickland*, 466 U.S. at 695)). Had even one of Petitioner's alibi witnesses testified, there is a reasonable probability the result at trial would have been different. *See Taylor*, 404 S.C. at 359, 745 S.E.2d at 102 (recognizing that to obtain relief, a PCR applicant must "demonstrate he was prejudiced by counsel's performance in such a manner that, but for counsel's error, there is a reasonable probability the result of the proceedings would have been different").

## Conclusion

Based on the foregoing, we find the evidence does not support the PCR court's dismissal of Petitioner's application for post-conviction relief. We reverse and remand for a new trial.

**REVERSED AND REMANDED.**

**KONDUROS and GEATHERS, JJ., concur.**